Justice KAGAN delivered the opinion of the Court.
*785 The question in this case is whether tribal sovereign immunity bars Michigan's suit against the Bay Mills Indian Community for opening a casino outside Indian lands. We hold that immunity protects Bay Mills from this legal action. Congress has not abrogated tribal sovereign immunity from a State's suit to enjoin gaming off a reservation or other Indian lands. And we decline to revisit our prior decisions holding that, absent such an abrogation (or a waiver), Indian tribes have immunity even when a suit arises from off-reservation commercial activity. Michigan must therefore resort to other mechanisms, including legal actions against the responsible individuals, to resolve this dispute.
I
The Indian Gaming Regulatory Act (IGRA or Act), 102 Stat. 2467, 25 U.S.C. § 2701 et seq., creates a framework for regulating gaming activity on Indian lands.[1] See § 2702(3) (describing the statute's purpose as establishing "regulatory authority ... [and] standards for gaming on Indian lands"). The Act divides gaming into three classes. Class III gaming, the most closely regulated and the kind involved here, includes casino games, slot machines, and horse racing. See § 2703(8). A tribe may conduct such gaming on Indian lands only pursuant to, and in compliance with, a compact it has negotiated with the surrounding State. See § 2710(d)(1)(C). A compact typically prescribes rules for operating gaming, allocates *2029 law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms. See §§ 2710(d)(3)(C)(ii), (v). Notable here, IGRA itself *786 authorizes a State to bring suit against a tribe for certain conduct violating a compact: Specifically, § 2710(d)(7)(A)(ii) allows a State to sue in federal court to "enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact ... that is in effect."
Pursuant to the Act, Michigan and Bay Mills, a federally recognized Indian Tribe, entered into a compact in 1993. See App. to Pet. for Cert. 73a-96a. The compact empowers Bay Mills to conduct class III gaming on "Indian lands"; conversely, it prohibits the Tribe from doing so outside that territory. Id., at 78a, 83a; see n. 1, supra . The compact also contains a dispute resolution mechanism, which sends to arbitration any contractual differences the parties cannot settle on their own. See App. to Pet. for Cert. 89a-90a. A provision within that arbitration section states that "[n]othing in this Compact shall be deemed a waiver" of either the Tribe's or the State's sovereign immunity. Id., at 90a. Since entering into the compact, Bay Mills has operated class III gaming, as authorized, on its reservation in Michigan's Upper Peninsula.
In 2010, Bay Mills opened another class III gaming facility in Vanderbilt, a small village in Michigan's Lower Peninsula about 125 miles from the Tribe's reservation. Bay Mills had bought the Vanderbilt property with accrued interest from a federal appropriation, which Congress had made to compensate the Tribe for 19th-century takings of its ancestral lands. See Michigan Indian Land Claims Settlement Act, 111 Stat. 2652. Congress had directed that a portion of the appropriated funds go into a "Land Trust" whose earnings the Tribe was to use to improve or purchase property. According to the legislation, any land so acquired "shall be held as Indian lands are held." § 107(a)(3), id., at 2658. Citing that provision, Bay Mills contended that the Vanderbilt property was "Indian land" under IGRA and the compact; and the Tribe thus claimed authority to operate a casino there.
*787 Michigan disagreed: The State sued Bay Mills in federal court to enjoin operation of the new casino, alleging that the facility violated IGRA and the compact because it was located outside Indian lands. The same day Michigan filed suit, the federal Department of the Interior issued an opinion concluding (as the State's complaint said) that the Tribe's use of Land Trust earnings to purchase the Vanderbilt property did not convert it into Indian territory. See App. 69-101. The District Court entered a preliminary injunction against Bay Mills, which promptly shut down the new casino and took an interlocutory appeal. While that appeal was pending, Michigan amended its complaint to join various tribal officials as defendants, as well as to add state law and federal common law claims. The Court of Appeals for the Sixth Circuit then vacated the injunction, holding (among other things) that tribal sovereign immunity barred Michigan's suit against Bay Mills unless Congress provided otherwise, and that § 2710(d)(7)(A)(ii) did not authorize the action. See 695 F.3d 406, 413-415 (2012). That provision of IGRA, the Sixth Circuit reasoned, permitted a suit against the Tribe to enjoin only gaming activity located on Indian lands, whereas the State's complaint alleged that the Vanderbilt casino was outside such territory. See id., at 412.[2] Accordingly, the Court of *2030 Appeals concluded that Michigan could proceed, if *788 at all, solely against the individual defendants, and it remanded to the District Court to consider those claims. See id., at 416-417.[3] Although no injunction is currently in effect, Bay Mills has not reopened the Vanderbilt casino.
We granted certiorari to consider whether tribal sovereign immunity bars Michigan's suit against Bay Mills, 570 U.S. ----, 133 S.Ct. 2850, 186 L.Ed.2d 907 (2013), and we now affirm the Court of Appeals' judgment.
II
Indian tribes are " 'domestic dependent nations' " that exercise "inherent sovereign authority." Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (Potawatomi ) (quoting Cherokee Nation v. Georgia, 5 Pet. 1, 17, 8 L.Ed. 25 (1831) ). As dependents, the tribes are subject to plenary control by Congress. See United States v. Lara, 541 U.S. 193, 200, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) ("[T]he Constitution grants Congress" powers "we have consistently described as 'plenary and exclusive' " to "legislate in respect to Indian tribes"). And yet they remain "separate sovereigns pre-existing the Constitution." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Thus, unless and "until Congress acts, the tribes retain" their historic sovereign authority. United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).
Among the core aspects of sovereignty that tribes possess-subject, again, to congressional action-is the "common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo, 436 U.S., at 58, 98 S.Ct. 1670. That immunity, we have explained, is "a necessary corollary to Indian sovereignty and self-governance." Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C., 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) ; cf. The Federalist No. 81, *789 p. 511 (B. Wright ed. 1961) (A. Hamilton) (It is "inherent in the nature of sovereignty not to be amenable" to suit without consent). And the qualified nature of Indian sovereignty modifies that principle only by placing a tribe's immunity, like its other governmental powers and attributes, in Congress's hands. See United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940) ( USF & G ) ("It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit"). Thus, we have time and again treated the "doctrine of tribal immunity [as] settled *2031 law" and dismissed any suit against a tribe absent congressional authorization (or a waiver). Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc., 523 U.S. 751, 756, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).
In doing so, we have held that tribal immunity applies no less to suits brought by States (including in their own courts) than to those by individuals. First in Puyallup Tribe, Inc. v. Department of Game of Wash., 433 U.S. 165, 167-168, 172-173, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), and then again in Potawatomi, 498 U.S., at 509-510, 111 S.Ct. 905, we barred a State seeking to enforce its laws from filing suit against a tribe, rejecting arguments grounded in the State's own sovereignty. In each case, we said a State must resort to other remedies, even if they would be less "efficient." Id., at 514, 111 S.Ct. 905; see Kiowa, 523 U.S., at 755, 118 S.Ct. 1700 ("There is a difference between the right to demand compliance with state laws and the means available to enforce them"). That is because, as we have often stated (and contrary to the dissent's novel pronouncement, see post, at 2046 (opinion of THOMAS, J.) (hereinafter the dissent)), tribal immunity "is a matter of federal law and is not subject to diminution by the States." 523 U.S., at 756, 118 S.Ct. 1700 (citing Three Affiliated Tribes, 476 U.S., at 891, 106 S.Ct. 2305; Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) ). Or as we elsewhere explained: While each State at the Constitutional Convention surrendered its immunity from suit by sister States, "it would be absurd to suggest that the tribes"-at a *790 conference "to which they were not even parties"-similarly ceded their immunity against state-initiated suits. Blatchford v. Native Village of Noatak, 501 U.S. 775, 782, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).
Equally important here, we declined in Kiowa to make any exception for suits arising from a tribe's commercial activities, even when they take place off Indian lands. In that case, a private party sued a tribe in state court for defaulting on a promissory note. The plaintiff asked this Court to confine tribal immunity to suits involving conduct on "reservations or to noncommercial activities." 523 U.S., at 758, 118 S.Ct. 1700. We said no. We listed Puyallup, Potawatomi , and USF & G as precedents applying immunity to a suit predicated on a tribe's commercial conduct-respectively, fishing, selling cigarettes, and leasing coal mines. 523 U.S., at 754-755, 118 S.Ct. 1700. Too, we noted that Puyallup involved enterprise "both on and off [the Tribe's] reservation." 523 U.S., at 754, 118 S.Ct. 1700 (quoting 433 U.S., at 167, 97 S.Ct. 2616)."[O]ur precedents," we thus concluded, have not previously "drawn the[ ] distinctions" the plaintiff pressed in the case. 523 U.S., at 755, 118 S.Ct. 1700. They had established a broad principle, from which we thought it improper suddenly to start carving out exceptions. Rather, we opted to "defer" to Congress about whether to abrogate tribal immunity for off-reservation commercial conduct. Id., at 758, 760, 118 S.Ct. 1700; see infra, at 2037 - 2038.
Our decisions establish as well that such a congressional decision must be clear. The baseline position, we have often held, is tribal immunity; and "[t]o abrogate [such] immunity, Congress must 'unequivocally' express that purpose." C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla., 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) (quoting Santa Clara Pueblo, 436 U.S., at 58, 98 S.Ct. 1670). That rule of construction reflects an enduring principle of *2032 Indian law: Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government. See, e.g., id., at 58-60, 98 S.Ct. 1670; Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) ; United States v. Dion, 476 U.S. 734, 738-739, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). *791 The upshot is this: Unless Congress has authorized Michigan's suit, our precedents demand that it be dismissed.[4] And so Michigan, naturally enough, makes two arguments: first, that IGRA indeed abrogates the Tribe's immunity from the State's suit; and second, that if it does not, we should revisit-and reverse-our decision in Kiowa, so that tribal immunity no longer applies to claims arising from commercial activity outside Indian lands. We consider-and reject-each contention in turn.
III
IGRA partially abrogates tribal sovereign immunity in § 2710(d)(7)(A)(ii) -but this case, viewed most naturally, falls outside that term's ambit. The provision, as noted above, authorizes a State to sue a tribe to "enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." See supra, at 2028; Kiowa, 523 U.S., at 758, 118 S.Ct. 1700 (citing the provision as an example of legislation "restrict[ing] tribal immunity from suit in limited circumstances"). A key phrase in that abrogation is "on Indian lands"-three words reflecting IGRA's overall scope (and repeated some two dozen times in the statute). A State's suit to enjoin gaming activity on Indian lands (assuming other requirements are met, see n. 6, infra ) falls within § 2710(d)(7)(A)(ii) ; a similar suit to stop gaming activity off Indian lands does not. And that creates a fundamental problem for Michigan. After all, the very premise of this suit-the reason Michigan thinks Bay Mills is acting unlawfully-is that the Vanderbilt casino is outside Indian lands. See App. to Pet. for Cert. 59a-60a. By dint of that theory, a suit to enjoin gaming in Vanderbilt is correspondingly outside § 2710(d)(7)(A)(ii)'s abrogation of immunity.
Michigan first attempts to fit this suit within § 2710(d)(7)(A)(ii) by relocating the "class III gaming activity" to which *792 it is objecting. True enough, Michigan states, the Vanderbilt casino lies outside Indian lands. But Bay Mills "authorized, licensed, and operated" that casino from within its own reservation. Brief for Michigan 20. According to the State, that necessary administrative action-no less than, say, dealing craps-is "class III gaming activity," and because it occurred on Indian land, this suit to enjoin it can go forward.
But that argument comes up snake eyes, because numerous provisions of IGRA show that "class III gaming activity" means just what it sounds like-the stuff involved in playing class III games. For example, § 2710(d)(3)(C)(i) refers to "the licensing and regulation of [a class III gaming] activity" and § 2710(d)(9) concerns the "operation of a class III gaming activity." Those phrases make perfect sense if "class III gaming activity" is what goes on in a casino-each roll of the dice and spin of the wheel. But they lose all meaning if, as Michigan argues, "class III gaming activity" refers equally to the off-site licensing or operation of the games.
*2033 (Just plug in those words and see what happens.) See also §§ 2710(b)(2)(A), (b)(4)(A), (c)(4), (d)(1)(A) (similarly referring to class II or III "gaming activity"). The same holds true throughout the statute. Section 2717(a)(1) specifies fees to be paid by "each gaming operation that conducts a class II or class III gaming activity"-signifying that the gaming activity is the gambling in the poker hall, not the proceedings of the off-site administrative authority. And §§ 2706(a)(5) and 2713(b)(1) together describe a federal agency's power to "clos [e] a gaming activity" for "substantial violation[s]" of law-e.g., to shut down crooked blackjack tables, not the tribal regulatory body meant to oversee them. Indeed, consider IGRA's very first finding: Many tribes, Congress stated, "have licensed gaming activities on Indian lands," thereby necessitating federal regulation. § 2701(1). The "gaming activit[y]" is (once again) the gambling. And that means § 2710(d)(7)(A)(ii) does not allow Michigan's suit even *793 if Bay Mills took action on its reservation to license or oversee the Vanderbilt facility.
Stymied under § 2710(d)(7)(A)(ii), Michigan next urges us to adopt a "holistic method" of interpreting IGRA that would allow a State to sue a tribe for illegal gaming off, no less than on, Indian lands. Brief for Michigan 30. Michigan asks here that we consider "IGRA's text and structure as a whole." Id., at 28. But (with one briefly raised exception) Michigan fails to identify any specific textual or structural features of the statute to support its proposed result.[5] Rather, Michigan highlights a (purported) anomaly of the statute as written: that it enables a State to sue a tribe for illegal gaming inside, but not outside, Indian country. "[W]hy," Michigan queries, "would Congress authorize a state to obtain a federal injunction against illegal tribal gaming on Indian lands, but not on lands subject to the state's own sovereign jurisdiction?" Reply Brief 1. That question has no answer, Michigan argues: Whatever words Congress may have used in IGRA, it could not have intended that senseless outcome. See Brief for Michigan 28.
*794 But this Court does not revise legislation, as Michigan proposes, just because the text as written creates an apparent anomaly as to some subject it does not address. Truth be told, such anomalies often arise from statutes, if for no other reason than that Congress typically legislates by parts-addressing one thing without examining all others that might merit comparable treatment. Rejecting a similar argument that a statutory anomaly (between property and non-property taxes) made "not a whit of sense," we explained in one recent case that "Congress wrote *2034 the statute it wrote"-meaning, a statute going so far and no further. See CSX Transp., Inc. v. Alabama Dept. of Revenue, 562 U.S. ----, ----, 131 S.Ct. 1101, 1113-1114, 179 L.Ed.2d 37 (2011). The same could be said of IGRA's abrogation of tribal immunity for gaming "on Indian lands." This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that (in Michigan's words) Congress "must have intended" something broader. Brief for Michigan 32. And still less do we have that warrant when the consequence would be to expand an abrogation of immunity, because (as explained earlier) "Congress must 'unequivocally' express [its] purpose" to subject a tribe to litigation. C & L Enterprises, 532 U.S., at 418, 121 S.Ct. 1589; see supra, at 2031.
In any event, IGRA's history and design provide a more than intelligible answer to the question Michigan poses about why Congress would have confined a State's authority to sue a tribe as § 2710(d)(7)(A)(ii) does. Congress adopted IGRA in response to this Court's decision in California v. Cabazon Band of Mission Indians, 480 U.S. 202, 221-222, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), which held that States lacked any regulatory authority over gaming on Indian lands. Cabazon left fully intact a State's regulatory power over tribal gaming outside Indian territory-which, as we will soon show, is capacious. See infra, at 2034 - 2035. So the problem Congress set out to address in IGRA ( Cabazon 's ouster of state authority) arose in Indian lands alone. And the solution Congress devised, naturally *795 enough, reflected that fact. See, e.g., Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("[T]he Act grants the States a power that they would not otherwise have, viz., some measure of authority over gaming on Indian lands"). Everything-literally everything-in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else. Small surprise that IGRA's abrogation of tribal immunity does that as well.[6]
And the resulting world, when considered functionally, is not nearly so "enigma[tic]" as Michigan suggests. Reply Brief 1. True enough, a State lacks the ability to sue a tribe for illegal gaming when that activity occurs off the reservation. But a State, on its own lands, has many other powers over tribal gaming that it does not possess (absent consent) in Indian territory. Unless federal law provides differently, "Indians going beyond reservation boundaries" are subject to any generally applicable state law. See *2035 Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 113, 126 S.Ct. 676, 163 L.Ed.2d 429 (2005) (quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) ). So, for example, Michigan could, in the first instance, deny a license to Bay Mills for an off-reservation *796 casino. See Mich. Comp. Laws Ann. §§ 432.206 - 432.206a (West 2001). And if Bay Mills went ahead anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license. See § 432.220; see also § 600.3801(1)(a) (West 2013) (designating illegal gambling facilities as public nuisances). As this Court has stated before, analogizing to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct. See Santa Clara Pueblo, 436 U.S., at 59, 98 S.Ct. 1670. And to the extent civil remedies proved inadequate, Michigan could resort to its criminal law, prosecuting anyone who maintains-or even frequents-an unlawful gambling establishment. See Mich. Comp. Laws Ann. §§ 432.218 (West 2001), 750.303, 750.309 (West 2004). In short (and contrary to the dissent's unsupported assertion, see post, at 2051), the panoply of tools Michigan can use to enforce its law on its own lands-no less than the suit it could bring on Indian lands under § 2710(d)(7)(A)(ii) -can shutter, quickly and permanently, an illegal casino.[7]
Finally, if a State really wants to sue a tribe for gaming outside Indian lands, the State need only bargain for a waiver of immunity. Under IGRA, a State and tribe negotiating a compact "may include ... remedies for breach of contract," 25 U.S.C. § 2710(d)(3)(C)(v) -including a provision allowing the State to bring an action against the tribe in the circumstances presented here. States have more than *797 enough leverage to obtain such terms because a tribe cannot conduct class III gaming on its lands without a compact, see § 2710(d)(1)(C), and cannot sue to enforce a State's duty to negotiate a compact in good faith, see Seminole Tribe, 517 U.S., at 47, 116 S.Ct. 1114 (holding a State immune from such suits). So as Michigan forthrightly acknowledges, "a party dealing with a tribe in contract negotiations has the power to protect itself by refusing to deal absent the tribe's waiver of sovereign immunity from suit." Brief for Michigan 40. And many States have taken that path. See Brief for Seminole Tribe of Florida et al. as Amici Curiae 12-22 (listing compacts with waivers of tribal immunity). To be sure, Michigan did not: As noted earlier, the compact at issue here, instead of authorizing judicial remedies, sends disputes to arbitration and expressly retains each party's sovereign immunity. See supra, at 2028. But Michigan-like any State-could have insisted on a different deal (and indeed may do so now for the future, because the current compact has expired and remains in effect only until the parties negotiate a new one, see Tr. of Oral Arg. 21). And in that event, the limitation Congress placed on IGRA's abrogation of tribal immunity-whether or not anomalous as an abstract matter-would have made no earthly difference. *2036 IV
Because IGRA's plain terms do not abrogate Bay Mills' immunity from this suit, Michigan (and the dissent) must make a more dramatic argument: that this Court should "revisit[ ] Kiowa 's holding" and rule that tribes "have no immunity for illegal commercial activity outside their sovereign territory." Reply Brief 8, 10; see post, at 2040. Michigan argues that tribes increasingly participate in off-reservation gaming and other commercial activity, and operate in that capacity less as governments than as private businesses. See Brief for Michigan 38 (noting, among other things, that "tribal gaming revenues have more than tripled" since Kiowa ). Further, Michigan contends, tribes have broader *798 immunity from suits arising from such conduct than other sovereigns-most notably, because Congress enacted legislation limiting foreign nations' immunity for commercial activity in the United States. See id., at 41; 28 U.S.C. § 1605(a)(2). It is time, Michigan concludes, to "level[ ] the playing field." Brief for Michigan 38.
But this Court does not overturn its precedents lightly. Stare decisis, we have stated, "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Although "not an inexorable command," id., at 828, 111 S.Ct. 2597,stare decisis is a foundation stone of the rule of law, necessary to ensure that legal rules develop "in a principled and intelligible fashion," Vasquez v. Hillery, 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). For that reason, this Court has always held that "any departure" from the doctrine "demands special justification." Arizona v. Rumsey, 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).
And that is more than usually so in the circumstances here. First, Kiowa itself was no one-off: Rather, in rejecting the identical argument Michigan makes, our decision reaffirmed a long line of precedents, concluding that "the doctrine of tribal immunity"-without any exceptions for commercial or off-reservation conduct-"is settled law and controls this case." 523 U.S., at 756, 118 S.Ct. 1700; see id., at 754-755, 118 S.Ct. 1700;supra, at 2030 - 2032. Second, we have relied on Kiowa subsequently: In another case involving a tribe's off-reservation commercial conduct, we began our analysis with Kiowa 's holding that tribal immunity applies to such activity (and then found that the Tribe had waived its protection). See C & L Enterprises, 532 U.S., at 418, 121 S.Ct. 1589. Third, tribes across the country, as well as entities and individuals doing business with them, have for many years relied on Kiowa (along with its forebears and progeny), negotiating their contracts and structuring their *799 transactions against a backdrop of tribal immunity. As in other cases involving contract and property rights, concerns of stare decisis are thus "at their acme." State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). And fourth (a point we will later revisit, see infra, at 2037 - 2039), Congress exercises primary authority in this area and "remains free to alter what we have done"-another factor that gives "special force" to stare decisis . Patterson v. McLean Credit Union, 491 U.S. 164, 172-173, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). To overcome all these reasons for this Court to stand pat, Michigan would need an ace up its sleeve.[8] *2037 But instead, all the State musters are retreads of assertions we have rejected before. Kiowa expressly considered the view, now offered by Michigan, that "when tribes take part in the Nation's commerce," immunity "extends beyond what is needed to safeguard tribal self-governance." 523 U.S., at 758, 118 S.Ct. 1700. (Indeed, as Kiowa noted, see id., at 757, 118 S.Ct. 1700,Potawatomi had less than a decade earlier rejected Oklahoma's identical contention that "because tribal business activities ... are now so detached from traditional tribal interests," immunity "no longer makes sense in [the commercial] context," 498 U.S., at 510, 111 S.Ct. 905.) So too, the Kiowa Court comprehended the trajectory of tribes' commercial activity (which is the dissent's exclusive rationale for ignoring stare decisis, see post, at 2050 - 2052). In the preceding decade, tribal gaming *800 revenues had increased more than thirty fold[9] (dwarfing the still strong rate of growth since that time, see supra, at 2035 - 2036); and Kiowa noted the flourishing of other tribal enterprises, ranging from cigarette sales to ski resorts, see 523 U.S., at 758, 118 S.Ct. 1700. Moreover, the Kiowa Court understood that other sovereigns did not enjoy similar immunity for commercial activities outside their territory; that seeming "anomal[y]" was a principal point in the dissenting opinion. See id., at 765, 118 S.Ct. 1700 (Stevens, J., dissenting). Kiowa did more, in fact, than acknowledge those arguments; it expressed a fair bit of sympathy toward them. See id., at 758, 118 S.Ct. 1700 (noting "reasons to doubt the wisdom of perpetuating the doctrine" as to off-reservation commercial conduct). Yet the decision could not have been any clearer: "We decline to draw [any] distinction" that would "confine [immunity] to reservations or to noncommercial activities." Ibid.
We ruled that way for a single, simple reason: because it is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity. The special brand of sovereignty the tribes retain-both its nature and its extent-rests in the hands of Congress. See Lara, 541 U.S., at 200, 124 S.Ct. 1628; Wheeler, 435 U.S., at 323, 98 S.Ct. 1079.Kiowa chose to respect that congressional responsibility (as Potawatomi had a decade earlier) when it rejected the precursor to Michigan's argument: Whatever our view of the merits, we explained, "we defer to the role Congress may wish to exercise in this important judgment." 523 U.S., at 758, 118 S.Ct. 1700; see Potawatomi, 498 U.S., at 510, 111 S.Ct. 905 (stating that because "Congress has always been at liberty to dispense with" or limit tribal immunity, "we are not disposed to modify" its scope). Congress, we said-drawing an analogy to its role in shaping foreign sovereign *801 immunity[10] -has the greater capacity "to weigh *2038 and accommodate the competing policy concerns and reliance interests" involved in the issue. 523 U.S., at 759, 118 S.Ct. 1700. And Congress repeatedly had done just that: It had restricted tribal immunity "in limited circumstances" (including, we noted, in § 2710(d)(7)(A)(ii) ), while "in other statutes" declaring an "intention not to alter" the doctrine. Id., at 758, 118 S.Ct. 1700; see Potawatomi, 498 U.S., at 510, 111 S.Ct. 905 (citing statutory provisions involving tribal immunity). So too, we thought, Congress should make the call whether to curtail a tribe's immunity for off-reservation commercial conduct-and the Court should accept Congress's judgment.
All that we said in Kiowa applies today, with yet one more thing: Congress has now reflected on Kiowa and made an initial (though of course not irrevocable) decision to retain that form of tribal immunity. Following Kiowa, Congress considered several bills to substantially modify tribal immunity *802 in the commercial context. Two in particular-drafted by the chair of the Senate Appropriations Subcommittee on the Interior-expressly referred to Kiowa and broadly abrogated tribal immunity for most torts and breaches of contract. See S. 2299, 105th Cong., 2d Sess. (1998); S. 2302, 105th Cong., 2d Sess. (1998). But instead of adopting those reversals of Kiowa , Congress chose to enact a far more modest alternative requiring tribes either to disclose or to waive their immunity in contracts needing the Secretary of the Interior's approval. See Indian Tribal Economic Development and Contract Encouragement Act of 2000, § 2, 114 Stat. 46 (codified at 25 U.S.C. § 81(d)(2) ); see also F. Cohen, Handbook of Federal Indian Law § 7.05[1][b], p. 643 (2012). Since then, Congress has continued to exercise its plenary authority over tribal immunity, specifically preserving immunity in some contexts and abrogating it in others, but never adopting the change Michigan wants.[11] So rather than confronting, as we did in Kiowa, a legislative vacuum as to *2039 the precise issue presented, we act today against the backdrop of a congressional choice: to retain tribal immunity (at least for now) in a case like this one.[12] *803 Reversing Kiowa in these circumstances would scale the heights of presumption: Beyond upending "long-established principle [s] of tribal sovereign immunity," that action would replace Congress's considered judgment with our contrary opinion. Potawatomi, 498 U.S., at 510, 111 S.Ct. 905. As Kiowa recognized, a fundamental commitment of Indian law is judicial respect for Congress's primary role in defining the contours of tribal sovereignty. See 523 U.S., at 758-760, 118 S.Ct. 1700; see also Santa Clara Pueblo, 436 U.S., at 60, 98 S.Ct. 1670 ("[A] proper respect ... for the plenary authority of Congress in this area cautions that [the courts] tread lightly"); Cohen, supra, § 2.01[1], at 110 ("Judicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law"). That commitment gains only added force when Congress has already reflected on an issue of tribal sovereignty, including immunity from suit, and declined to change settled law. And that force must grow greater still when Congress considered that issue partly at our urging. See Kiowa, 523 U.S., at 758, 118 S.Ct. 1700 (hinting, none too subtly, that "Congress may wish to exercise" its authority over the question presented). Having held in Kiowa that this issue is up to Congress, we cannot reverse ourselves because some may think its conclusion wrong. Congress of course may always change its mind-and we would readily defer to that new decision. But it is for Congress, now more than ever, to say whether to create an exception to tribal immunity for off-reservation commercial activity. As in Kiowa -except still more so-"we decline to revisit our case law[,] and choose" instead "to defer to Congress." Id., at 760, 118 S.Ct. 1700.
V
As "domestic dependent nations," Indian tribes exercise sovereignty subject to the will of the Federal Government. Cherokee Nation, 5 Pet., at 17. Sovereignty implies immunity from lawsuits. Subjection means (among much else) that Congress can abrogate that immunity as and to the extent *804 it wishes. If Congress had authorized this suit, Bay Mills would have no valid grounds to object. But Congress has not done so: The abrogation of immunity in IGRA applies to gaming on, but not off, Indian lands. We will not rewrite Congress's handiwork. Nor will we create a freestanding exception to tribal immunity for all off-reservation commercial conduct. This Court has declined that course once before. To choose it now would entail both overthrowing our precedent and usurping Congress's current policy judgment. Accordingly, Michigan may not sue Bay Mills to enjoin the Vanderbilt casino, but must instead use available alternative means to accomplish that object.
We affirm the Sixth Circuit's judgment and remand the case for further proceedings consistent with this opinion.
It is so ordered.

The Act defines "Indian lands" as "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual[,] or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." § 2703(4).

The Sixth Circuit framed part of its analysis in jurisdictional terms, holding that the District Court had no authority to consider Michigan's IGRA claim because § 2710(d)(7)(A)(ii) provides federal jurisdiction only over suits to enjoin gaming on Indian lands (and Michigan's suit was not that). See 695 F.3d, at 412-413. That reasoning is wrong, as all parties agree. See Brief for Michigan 22-25; Brief for Bay Mills 23-24; Brief for United States as Amicus Curiae 16-17. The general federal-question statute, 28 U.S.C. § 1331, gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA. Nothing in § 2710(d)(7)(A)(ii) or any other provision of IGRA limits that grant of jurisdiction (although those provisions may indicate that a party has no statutory right of action). See Verizon Md. Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 643-644, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002).

The Court of Appeals' decision applied not only to Michigan's case, but also to a consolidated case brought by the Little Traverse Bay Bands of Odawa Indians, which operates a casino about 40 miles from the Vanderbilt property. Little Traverse subsequently dismissed its suit, rather than seek review in this Court.

Michigan does not argue here that Bay Mills waived its immunity from suit. Recall that the compact expressly preserves both the Tribe's and the State's sovereign immunity. See supra, at 2028.

Michigan's single reference to another statutory provision, 18 U.S.C. § 1166, does not advance its argument, because that term includes a geographical limitation similar to the one appearing in § 2710(d)(7)(A)(ii). Section 1166 makes a State's gambling laws applicable "in Indian country" as federal law, and then gives the Federal Government "exclusive jurisdiction over criminal prosecutions" for violating those laws. 18 U.S.C. § 1166(a), (d). Michigan briefly argues that, by negative implication, § 1166 gives a State the power "to bring a civil suit to enforce [its] anti-gambling laws in Indian country," and that this power applies "even when the defendant is an Indian tribe." Brief for Michigan 26 (emphasis added). Bay Mills and the United States vigorously contest both those propositions, arguing that § 1166 gives States no civil enforcement authority at all, much less as against a tribe. See Brief for Bay Mills 30-31; Brief for United States as Amicus Curiae 20-22. But that dispute is irrelevant here. Even assuming Michigan's double inference were valid, § 1166 would still allow a State to sue a tribe for gaming only "in Indian country." So Michigan's suit, alleging that illegal gaming occurred on state lands, could no more proceed under § 1166 than under § 2710(d)(7)(A)(ii).

Indeed, the statutory abrogation does not even cover all suits to enjoin gaming on Indian lands, thus refuting the very premise of Michigan's argument-from-anomaly. Section 2710(d)(7)(A)(ii), recall, allows a State to sue a tribe not for all "class III gaming activity located on Indian lands" (as Michigan suggests), but only for such gaming as is "conducted in violation of any Tribal-State compact ... that is in effect." Accordingly, if a tribe opens a casino on Indian lands before negotiating a compact, the surrounding State cannot sue; only the Federal Government can enforce the law. See 18 U.S.C. § 1166(d). To be precise, then, IGRA's authorization of suit mirrors not the full problem Cabazon created (a vacuum of state authority over gaming in Indian country) but, more particularly, Congress's "carefully crafted" compact-based solution to that difficulty. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 73-74, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). So Michigan's binary challenge-if a State can sue to stop gaming in Indian country, why not off?-fails out of the starting gate. In fact, a State cannot sue to enjoin all gaming in Indian country; that gaming must, in addition, violate an agreement that the State and tribe have mutually entered.

Michigan contends that these alternative remedies may be more intrusive on, or less respectful of, tribal sovereignty than the suit it wants to bring. See Brief for Michigan 15; Tr. of Oral Arg. 18. Bay Mills, which presumably is better positioned to address that question, emphatically disagrees. See id., at 32-33. And the law supports Bay Mills' position: Dispensing with the immunity of a sovereign for fear of pursuing available remedies against its officers or other individuals would upend all known principles of sovereign immunity.

Adhering to stare decisis is particularly appropriate here given that the State, as we have shown, has many alternative remedies: It has no need to sue the Tribe to right the wrong it alleges. See supra, at 2034 - 2035. We need not consider whether the situation would be different if no alternative remedies were available. We have never, for example, specifically addressed (nor, so far as we are aware, has Congress) whether immunity should apply in the ordinary way if a tort victim, or other plaintiff who has not chosen to deal with a tribe, has no alternative way to obtain relief for off-reservation commercial conduct. The argument that such cases would present a "special justification" for abandoning precedent is not before us. Arizona v. Rumsey, 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).

See Nat. Gambling Impact Study Comm'n, Final Report, pp. 6-1 to 6-2 (1999), online at http://govinfo.library.unt.edu/ngisc/reports/6.pdf (as visited Apr. 30, 2014, and available in Clerk of Court's case file).

Kiowa explained that Congress, in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1605(a)(2), "den[ied] immunity for the commercial acts of a foreign nation," codifying an earlier State Department document, known as the Tate Letter, announcing that policy. 523 U.S., at 759, 118 S.Ct. 1700. Michigan takes issue with Kiowa 's account, maintaining that this Court took the lead in crafting the commercial exception to foreign sovereign immunity, and so should feel free to do the same thing here. See Reply Brief 6-7. But the decision Michigan cites, Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), does not show what the State would like. First, Michigan points to a part of the Dunhill opinion commanding only four votes, see id., at 695-706, 96 S.Ct. 1854 (opinion of White, J.); the majority's decision was based on the act of state doctrine, not on anything to do with foreign sovereign immunity, see id., at 690-695, 96 S.Ct. 1854. And second, even the plurality opinion relied heavily on the views of the Executive Branch as expressed in the Tate Letter-going so far as to attach that document as an appendix. See id., at 696-698, 96 S.Ct. 1854 (opinion of White, J.); id., at 711-715, 96 S.Ct. 1854 (appendix 2 to opinion of the Court). The opinion therefore illustrates what Kiowa highlighted: this Court's historic practice of "deferr[ing] to the decisions of the political branches," rather than going it alone, when addressing foreign sovereign immunity. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

Compare, e.g., Prevent All Cigarette Trafficking Act of 2009, §§ 2(e), (3)(a), 124 Stat. 1101, 1108 (preserving immunity), with Arizona Water Settlements Act, §§ 213(a)(2), 301, 118 Stat. 3531, 3551 (abrogating immunity). The dissent's claim that "Congress has never granted tribal sovereign immunity in any shape or form," post, at 2052, apparently does not take into account the many statutes in which Congress preserved or otherwise ratified tribal immunity. See, e.g., 25 U.S.C. § 450n ; see generally Potawatomi, 498 U.S., at 510, 111 S.Ct. 905 ("Congress has consistently reiterated its approval of the immunity doctrine").

The dissent principally counters that this history is not "relevan[t]" because Kiowa was a "common-law decision." Post, at 2053. But that is to ignore what Kiowa (in line with prior rulings) specifically told Congress: that tribal immunity, far from any old common law doctrine, lies in Congress's hands to configure. See 523 U.S., at 758, 118 S.Ct. 1700 ; Potawatomi, 498 U.S., at 510, 111 S.Ct. 905;Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58-60, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). When we inform Congress that it has primary responsibility over a sphere of law, and invite Congress to consider a specific issue within that sphere, we cannot deem irrelevant how Congress responds.