The subsequent treatment of the land in question does support the conclusion that the Oneida reservation was diminished, however. The numerous statements of federal officials referring to the "former reservation," even if ambiguous as to disestablishment, at least manifest the view that the original boundaries were no longer intact. Just as in Stockbridge-Munsee , "the land became subject to state taxes, and the Department of the Interior refused to intervene in alcohol-related problems within the original reservation." 554 F.3d at 665. In 1903, the Wisconsin legislature enacted legislation to create the towns of Hobart and Oneida "from the territory now embraced within the Oneida Reservation in said counties" and conferred upon them "all the rights, powers and privileges conferred upon and granted to other towns in the state of Wisconsin." DSUMF ¶ 37. Soon thereafter, each town formed its own government. This court's decision in Stevens , though not entitled to preclusive effect, also constitutes evidence of the manner in which the Reservation was viewed by federal officials prior to the enactment of the IRA and demonstrates that once fee patents were granted, local property taxes were assessed.
Other state and federal officials also viewed the Oneida Reservation as at least diminished. In 1919, the Office of Indian Affairs, the predecessor to the Bureau of Indian Affairs, closed the Oneida Agency and transferred jurisdiction over the Oneida to the Keshena Agency, located on the Menominee Reservation. Id. ¶ 53. In 1931, the Attorney General of the State of Wisconsin wrote a letter addressing jurisdiction with respect to the Oneida in which he stated:
There is very little tribal land left, and most of the individual allotments have passed from the control of the United States and are therefore subject to the unquestioned jurisdiction of the state. However, in the case of the small amount of tribal land remaining and the individual allotments which are still held in trust, the federal courts would have jurisdiction .... Most of the Oneidas have received a fee patent discharged of any trust. Many of them have sold their lands. The state has jurisdiction over those Indians that have a fee patent.
Id. ¶ 76. On November 19, 1931, C.J. Rhoads, the Commissioner of Indian Affairs, wrote to a member of the Tribe concerning hunting and fishing rights:
Generally speaking, the State game laws apply to the Indians except when exercising their hunting and fishing privileges on tribal Indian land within their reservation or, if allotted, within the limits *522 of their own allotments still held in trust or under restricted patents.
There are only a few small tracts of tribal Indian land within the limits of what was formerly the Oneida Indian Reservation. The ceded land to which the Indian title has been extinguished no longer belongs to the Indians, and as you have received a fee patent to your ... land and the Oneida Indian Reservation has been broken up, you would have no special hunting or fishing privileges thereon because of the fact that you are an Indian. Under the circumstances you should comply with the state laws and regulations as to season, license, etc.
Id. ¶ 78.
This and other similar evidence cited by the Village supports the conclusion that in the aftermath of the 1906 Act and up until the enactment of the IRA, the Oneida Reservation was substantially diminished, though not completely disestablished. In 1975, the United States Department of the Interior's Bureau of Indian Affairs issued a report entitled "Statistical Data for Planning Oneida Reservation," which stated that "the total acreage of this reservation is 2,581 acres-2,108 acres are tribally owned and 473 acres are allotted." Id. ¶ 123. The report noted that "by 1930 only a thousand acres remained. In 1934, through a series of land purchases, the acreage was increased to the present amount." Id.
As the Village points out, and as this court noted in a previous case between the parties, in more recent years the Nation has made substantial purchases of land within the original reservation boundaries. Id. ¶¶ 128-29; Oneida Tribe of Wis. v. Vill. of Hobart , 542 F.Supp.2d 908, 913 (E.D. Wis. 2008). But the Nation's purchase of property on the open market does not by itself increase the size of its Reservation. See City of Sherrill, N.Y. v. Oneida Nation of N.Y. , 544 U.S. 197, 202-03, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005) ("Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders."). As of December 28, 2017, however, 14,078.612 acres of the original Reservation are held in trust on behalf of the Nation. Def.'s Statement of Additional Proposed Undisputed Material Facts ¶ 12, ECF No. 100. The record is silent, however, as to how much of the total acreage held in trust is within the Village, but this acreage reflects the current size and location of the Oneida Reservation.
C. Enforcement of the Ordinance
It follows from the foregoing that the Village may enforce the Ordinance on those lands not held in trust by the United States for the benefit of the Nation. There is no dispute that the activities associated with the Big Apple Fest take place at least in part on land that is not part of the Oneida Reservation but instead is non-trust land owned by the Nation in fee simple. It is also undisputed that in order to conduct its festival, the Nation closes off, in whole or in part, streets and highways that are also not part of the current reservation. As the Village notes, the stated purpose of the Ordinance is "to address potential impacts on the general public of a special event, including without limitation noise, light, dust, traffic, parking, and other *523 public health safety and welfare concerns," as well as "to promote the economic welfare and general prosperity of the community by safeguarding and preserving property values by addressing potential impacts of a special event." Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 94, at 48 (citing ECF No. 86-1, § 250-2). These are lawful purposes under the Village's police power, Wis. Stat. § 61.34 (2017-18), and the Nation does not contend that they are not. Nor does the Nation contend that compliance would create a hardship or that the Village would unreasonably deny it a permit. Instead, the Nation's sole argument is that it is immune and not subject to the Ordinance because it's special event occurs within the boundaries of its 1838 Reservation boundaries, the entirety of which it claims constitutes Indian country. For the reasons set forth above, the court concludes that it does not and instead holds that only those portions of the original Reservation held in trust by the United States for the benefit of the Nation, as well as any allotments still under trust patents, constitute Indian country.
In truth, the implications of the Nation's argument are quite breathtaking. If accepted, then not only are the Nation and its members immune from the regulatory measures of the Village, but also those of a substantial portion of the City of Green Bay, Brown and Outagamie Counties, and the State of Wisconsin. To hold in its favor would mean that the Nation has primary jurisdiction over land largely populated by people who have no say in its governing body. Because the Oneida Reservation has been diminished, however, and does not include land held in fee, the Nation's argument fails. The Nation is therefore not entitled to the relief it seeks, and the Village's motion for summary judgment will be granted.
D. The Nation's Sovereign Immunity
As a final matter, the Nation asserts that its sovereign immunity bars the Village's counterclaim for enforcement of the Ordinance against the Nation and the payment of the $ 5,000 fine issued through the citation. It is well established that Indian tribes possess immunity from suit traditionally enjoyed by sovereign powers. See, e.g., Okla.Tax Comm'n v. Citizen Band Potawatomi Indian Tribe , 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). In other words, tribes are protected from suits for monetary damages. See Quinault Indian Nation v. Pearson for Estate of Comenout , 868 F.3d 1093, 1096 (9th Cir. 2017). "[A]n Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc. , 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). The Village acknowledges that the Supreme Court has held tribal immunity bars claims against an Indian Tribe arising from commercial activity outside Indian lands. See Michigan v. Bay Mills Indian Cmty. , 572 U.S. 782, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014). It nevertheless argues that the bar is not complete if an alternative mechanism is not available for the enforcement of its Ordinance. See id. at 795, 134 S.Ct. 2024.
But as the Court suggested, the Village in this case may have other tools that it can use to enforce its laws on its own lands, for example, bringing a suit against tribal officers responsible for unlawful conduct. Id. As an extreme measure, the Village could presumably act to shut down the event if the Nation again sought to hold it without a permit, but there is no reason to believe that such an extreme measure will be necessary. The Nation brought this action to vindicate its *524 sincerely held belief that it is not subject to the authority of the Village in the enforcement of the Ordinance. Should it not ultimately prevail, there is no reason to believe that the Nation will not comply with the Ordinance. In any event, the Nation is immune and the Village's counterclaim for monetary damages must be dismissed.
CONCLUSION
For the reasons set forth above, I conclude that the Treaty of 1838 created the Oneida Reservation. I also conclude that, while there is no evidence of congressional intent to disestablish the Reservation, Congress's intent to at least diminish the Reservation is manifest in the Dawes Act and the Act of 1906, and that intent was effectuated with the issuance of unrestricted fee patents for the allotted land within the Reservation. To the extent the Nation's special event was held on property not held in trust by the United States, it is subject to the Ordinance. In addition, the Village's counterclaim for monetary damages is barred and must be dismissed. The Nation's motion for summary judgment (ECF No. 85) is therefore GRANTED-IN-PART and DENIED-IN-PART and the Village's motion for summary judgment (ECF No. 84) is accordingly GRANTED . The Clerk is directed to set the matter for a telephone conference to address the need for further proceedings as well as the form of the judgment to be entered.
SO ORDERED at Green Bay, Wisconsin this 28th day of March, 2019.