EDWARDS, Senior Circuit Judge,
dissenting:
This case is about Appellants’ not-so-veiled attempt to gut the Patient Protec *413 tion and Affordable Care Act (“ACA”). The ACA requires every State to establish a health insurance “Exchange,” which “shall be a governmental agency or nonprofit entity that is established by a State.” 42 U.S.C. § 18031(b)(1), (d)(1). The Department of Health and Human Services (“HHS”) is required to establish “such Exchange” when the State elects not to create one. Id. § 18041(c)(1). Taxpayers who purchase insurance from an Exchange and whose income is between 100% and 400% of the poverty line are eligible for premium subsidies. 26 U.S.C. § 36B(a), (c)(1)(A). Appellants challenge regulations issued by the Internal Revenue Service (“IRS”) and HHS making these subsidies available in all States, including States in which HHS has established an Exchange on behalf of the State. In support of their challenge, Appellants rely on a specious argument that there is no “Exchange established by the State” in States with HHS-created Exchanges and, therefore, that taxpayers who purchase insurance in these States cannot receive subsidies.
As explained below, there are three critical components to the ACA: nondiscrimination requirements applying to insurers; the “individual mandate” requiring individuals who are not covered by an employer to purchase minimum insurance coverage or to pay a tax penalty; and premium subsidies which ensure that the individual mandate will have a broad enough sweep to attract enough healthy individuals into the individual insurance markets to create stability. These components work in tandem. At the time of the ACA’s enactment, it was well understood that without the subsidies, the individual mandate was not viable as a mechanism for creating a stable insurance market.
Appellants’ proffered construction of the statute would permit States to exempt many people from the individual mandate and thereby thwart a central element of the ACA. As Appellants’ amici candidly acknowledge, if subsidies are unavailable to taxpayers in States with HHS-created Exchanges, “the structure of the ACA will crumble.” Scott Pruitt, Obama Care’s Next Legal Challenge, Wall St. J., Dec. 1, 2013. It is inconceivable that Congress intended to give States the power to cause the ACA to “crumble.”
Appellants contend that the phrase “Exchange established by the State” in § 36B unambiguously bars subsidies to individuals who purchase insurance in States in which HHS created the Exchange on the State’s behalf. This argument fails because “the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” Nat'l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 666, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (internal quotation marks omitted). When the language of § 36B is viewed in context — ie., in conjunction with other provisions of the ACA — it is quite clear that the statute does not reveal the plain meaning that Appellants would like to find.
Because IRS and HHS have been delegated authority to jointly administer the ACA, this case is governed by the familiar framework of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under Chevron, if “the statute is silent or ambiguous with respect to the specific issue,” we defer to the agency’s construction of the statute, so long as it is “permissible.” Id. at 843, 104 S.Ct. 2778. The Government’s permissible interpretation of the statute easily survives review under Chevron. The Act contemplates that an Exchange created by the federal government on a State’s behalf will have equivalent legal standing with State-creat *414 ed Exchanges. 42 U.S.C. § 18041. And the ACA would be self-defeating if taxpayers who purchase insurance from an HHS-created Exchange are deemed ineligible to receive subsidies. Appellants’ argument cannot be squared with the clear legislative scheme established by the statute as a whole.
Apparently recognizing the weakness of a claim that rests solely on § 36B, divorced from the rest of the ACA, Appellants attempt to fortify their position with the extraordinary argument that Congress tied the availability of subsidies to the existence of State-established Exchanges to encourage States to establish their own Exchanges. This claim is nonsense, made up out of whole cloth. There is no credible evidence in the record that Congress intended to condition subsidies on whether a State, as opposed to HHS, established the Exchange. Nor is there credible evidence that any State even considered the possibility that its taxpayers would be denied subsidies if the State opted to allow HHS to establish an Exchange on its behalf.
The majority opinion ignores the obvious ambiguity in the statute and claims to rest on plain meaning where there is none to be found. In so doing, the majority misapplies the applicable standard of review, refuses to give deference to the IRS’s and HHS’s permissible constructions of the ACA, and issues a judgment that portends disastrous consequences. I therefore dissent.
I. Standard of Review
The first question a reviewing court must ask in a case of this sort is whether the disputed provisions of the statute are clear beyond dispute. “If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.” Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. In determining whether a statutory provision is ambiguous, however, a court must evaluate it within the context of the statute as a whole:
[A] reviewing court should not confine itself to examining a particular statutory provision in isolation. Rather, the meaning — or ambiguity — of certain words or phrases may only become evident when placed in context.... It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.
Nat’l Ass’n of Home Builders, 551 U.S. at 666, 127 S.Ct. 2518 (citations, alteration, and internal quotation marks omitted); see also FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33,120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); Davis v. Mich. Dep’t of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989).
In other words, “[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The Supreme Court just recently reiterated this principle, making it clear that even when a statute is not “a chef d’oeuvre of legislative draftsmanship” — as the ACA is not — courts must bear “in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” Util. Air Regulatory Grp. v. EPA, — U.S. -, 134 S.Ct. 2427, 2441, 189 L.Ed.2d 372 (2014) (internal quotation marks omitted).
When a “court determines Congress has not directly addressed the precise question at issue, the court does not simply impose *415 its own construction on the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778. Rather, “the question for the court is whether the agency’s answer is based on a permissible construction of the statute,” id., that is, whether the agency’s interpretation is “manifestly contrary to the statute,” id. at 844, 104 S.Ct. 2778. See, e.g., Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 131 S.Ct. 704, 711, 178 L.Ed.2d 588 (2011) (deferring to the agency’s interpretation because the statute did not speak with “the precision necessary” to definitively answer the question, and the agency’s interpretation was not “manifestly contrary to the statute”).
Appellants argue that Chevron deference is unwarranted because some of the provisions at issue “are codified in a chapter of Title 42 ... the domain of HHS, not the IRS,” and the “IRS has no power to enforce or administer those provisions.” Br. for Appellants at 46. Appellants’ position is mistaken. Chevron applies because IRS and HHS are tasked with administering the provisions of the ACA in coordination. See 42 U.S.C. § 18082(a); Nat’l Ass’n of Home Builders, 551 U.S. at 665, 127 S.Ct. 2518 (applying Chevron deference to a regulation promulgated by the National Marine Fisheries Service and the Fish and Wildlife Service “acting jointly”). Here, there is no issue of one agency interpreting the statute in a way that conflicts with the other agency’s interpretation. The IRS’s rule defines “Exchange” by reference to the HHS’s definition, which provides that subsidies are available to low-income taxpayers purchasing insurance on an Exchange “regardless of whether the Exchange is established and operated by a State ... or by HHS.” 45 C.F.R. § 155.20; 26 C.F.R. § 1.36B-1(k).
Appellants also argue that Chevron deference is precluded by the canon that “tax credits ‘must be expressed in clear and unambiguous terms.’ ” Br. for Appellants at 51 (quoting Yazoo & Miss. Valley R.R. Co. v. Thomas, 132 U.S. 174, 183, 10 S.Ct. 68, 33 L.Ed. 302 (1889)). Again, Appellants’ position is mistaken. The Supreme Court has made clear that “[t]he principles underlying [the] decision in Chevron apply with full force in the tax context.” Mayo Found., 131 S.Ct. at 713.
Chevron plainly applies to this case. And this court is obliged to defer to the IRS’s and HHS’s “permissible” interpretations of the ACA. Chevron, 467 U.S. at 843, 104 S.Ct. 2778.
II. Analysis
Appellants’ argument focuses almost entirely on 26 U.S.C. § 36B, considered in isolation from the other provisions of the ACA. Repeating the phrase “Exchange established by the State” as a mantra throughout their brief, Appellants contend that this language unambiguously indicates that § 36B(b) conditions refundable tax credits on a State — and not HHS — establishing an Exchange.
Appellants’ argument unravels, however, when the phrase “established by the State” is subject to close scrutiny in view of the surrounding provisions in the ACA. See Brown & Williamson, 529 U.S. at 132, 120 S.Ct. 1291 (“The ... ambiguity ... of certain ... phrases may only become evident when placed in context.”). In particular, § 36B has no plain meaning when read in conjunction with § 18031(d)(1) and § 18041(c). And, more fundamentally, the purported plain meaning of § 36B(b) would subvert the careful policy scheme crafted by Congress, which understood when it enacted the ACA that subsidies were critically necessary to ensure that the goals of the ACA could be achieved. Simply put, § 36B(b) interpreted as Appellants urge would function as a poison pill to the insurance markets in the States that *416 did not elect to create their own Exchanges. This surely is not what Congress intended.
Perhaps because they appreciate that no legitimate method of statutory interpretation ascribes to Congress the aim of tearing down the very thing it attempted to construct, Appellants in this litigation have invented a narrative to explain why Congress would want health insurance markets to fail in States that did not elect to create their own Exchanges. Congress, they assert, made the subsidies conditional in order to incentivize the States to create their own exchanges. This argument is disingenuous, and it is wrong. Not only is there no evidence that anyone in Congress thought § 36B operated as a condition, there is also no evidence that any State thought of it as such. And no wonder: The statutory provision presumes the existence of subsidies and was drafted to establish a formula for the payment of tax credits, not to impose a significant and substantial condition on the States.
It makes little sense to think that Congress would have imposed so substantial a condition in such an oblique and circuitous manner. See Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (“Congress ... does not alter the fundamental details of a regulatory scheme in vague terms.... ”)• The simple truth is that Appellants’ incentive story is a fiction, a post hoc narrative concocted to provide a colorable explanation for the otherwise risible notion that Congress would have wanted insurance markets to collapse in States that elected not to create their own Exchanges.
In the end, the question for this court is whether § 36B unambiguously operates as a condition limiting the tax subsidies that Congress understood were a necessary part of a functioning insurance market to only those States that created their own exchange. The phrase “Exchange established by the State,” standing alone, suggests the affirmative. But there is powerful evidence to the contrary — both in § 36B and the provisions it references, and in the Act as a whole-that shows Appellants’ argument to be fatally flawed.
It is not the prerogative of this court to interpret the ambiguities uncovered in the ACA. Congress has delegated this authority to the IRS and HHS. And the interpretation given by these agencies is not only permissible but also the better construction of the statute because § 36B is not clearly drafted as a condition, because the Act empowers HHS to establish exchanges on behalf of the States, because parallel provisions indicate that Congress thought that federal subsidies would be provided on HHS-created exchanges, and, most importantly, because Congress established a careful legislative scheme by which individual subsidies were essential to the basic viability of individual insurance markets.
A. Appellants’ “Plain Meaning” Argument Viewed in Context
In arguing that the ACA clearly and unambiguously bars subsidies to individuals who purchase insurance in States in which HHS created the Exchange on the State’s behalf, Appellants rest on a narrow, out-of-context interpretation of § 36B(b) and § 36B(c)(2)(A)(i). Br. for Appellants at 16. Appellants argue that because there is no “Exchange established by the State” in States with HHS-created Exchanges, taxpayers who purchase insurance in these States cannot receive subsidies. This plain meaning argument, which views § 36B in isolation, is simplistic and wrong.
We cannot read § 36B in isolation; we must also consider the specific context of the provision and the “broader context of the statute as a whole.” Robinson, 519 *417 U.S. at 341, 117 S.Ct. 843. And viewing the matter through this wider lens, as we must, the provision which initially might appear plain is far from unambiguous. To begin with, as the Government points out, § 36B refers to premiums for health plans enrolled in through “an Exchange established by the State under 1311 [ie., 42 U.S.C. § 18031].” 26 U.S.C. § 36B(b) (emphasis added). The cross-referenced provision — 42 U.S.C. § 18031 — contains language indicating that all States are required to establish an exchange under the section. See 42 U.S.C. § 18031(b)(1) (“Each State shall ... establish an American Health Benefit Exchange.... ”); see also id. § 18031(d)(1) (“An Exchange shall be a governmental agency or nonprofit entity that is established by a State.” (emphasis added)). In other words, if our statutory universe consisted only of these two provisions, it would be clear that § 36B intended that residents in all States would receive subsidies because all States were required to create such exchanges by the section of the Act referenced in § 36B.
Of course, the ACA is broader than just § 36B and § 18031, and in 42 U.S.C. § 18041 it permits a State to elect to allow HHS to establish the Exchange on behalf of the State. In such circumstances, however, the Act requires HHS to establish and operate “such Exchange.” Id. § 18041(c) (emphasis added). The use of “such” can reasonably be interpreted to deem the HHS-created Exchange to be the equivalent of an Exchange created in the first instance by the State. That is, when HHS creates an exchange under § 18041(c), it does so on behalf of the State, essentially standing in its stead. Put differently, under the ACA, an Exchange within a State is a given. The only question is whether the State opts to create the Exchange on its own or have HHS do it on its behalf. On this view, “established by the State” is term of art that includes any Exchange within a State.
Indeed, the Act says as much when it defines the term “Exchange” as “a governmental agency or nonprofit entity that is established by a State.” 42 U.S.C. § 18031(d)(1). It is clear that § 18031 is the source of the definition of the term “Exchange” under the Act. See 42 U.S.C. § 300gg-91(d)(21) (defining “Exchange” for purpose of Public Health Service Act to mean what it does in § 18031); id. § 18111 (incorporating the definitions in § 300gg-91 for purpose of Title I of the ACA). It is also clear that § 18031 defines every “Exchange” under the Act as “a governmental agency or nonprofit entity that is established by a State.” Id. § 18031(d)(1) (emphasis added). Because § 18041(c) authorizes the federal government to establish “Exchanges,” the phrase “established by the State” in § 18031 must be broad enough to accommodate Exchanges created by the HHS on a State’s behalf. Section 36B expressly incorporates this broad definition of “Exchange” when it uses the phrase an “Exchange established by the State under [§ 18031].” 26 U.S.C. § 36B(b) (emphasis added). Therefore, the phrase “established by the State” in § 36B is reasonably understood to take its meaning from the cognate language in the incorporated definition in § 18031, which embraces Exchanges created by HHS on the State’s behalf. See, e.g., Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (noting “the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning” (internal quotation marks omitted)). These provisions belie the “plain meaning” that Appellants attempt to attribute to § 36B.
What is more, Appellants’ interpretation of the operative language in § 36B sits *418 awkwardly with the section’s structure. Subsection (a) provides tax credits to any “applicable taxpayer,” defined in reference to the poverty line and without regard to what the taxpayer’s State has or has not done. 26 U.S.C. § 36B(a), (c)(1)(A). Subsection (b) then establishes a numerical formula for calculating the amount of the subsidy. Id. § 36B(b). It is only in the context of this numerical formula and its definition of “coverage month” that the purported condition is found. Id. § 36B(b)(£), (c)(2)(A)®. If Congress intended to create a significant condition on taxpayer eligibility for subsidies of the sort advocated by Appellants, one would expect that it would say so plainly and clearly. See Am. Trucking Ass’ns, 531 U.S. at 468, 121 S.Ct. 903. There is no “if/then” or other such conditional language in § 36B. Instead, if Appellants are to be believed, Congress thought it appropriate to ineen-tivize significant State action (creating Exchanges) through an oblique and indirect condition. This is an implausible reading of the statute.
The simple truth is that the phrase “established by the State” in § 36B does not have the plain meaning that Appellants would like. The inquiry does not end with a narrow look at § 36B. That provision must be read in conjunction with § 18031(d)(1) and § 18041(c); and these provisions, read together, defy any claim of plain meaning.
Furthermore, in order to address the question before us, this court is obliged to consider § 36B in “the broader context of the statute as a whole.” Robinson, 519 U.S. at 341, 117 S.Ct. 843; see also Zuni Pub. Sch. Dist. No. 89 v. Dep’t of Educ., 550 U.S. 81, 98, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007) (looking to “basic purpose and history” of statute). The Supreme Court’s recent decision in Michigan v. Bay Mills Indian Community, — U.S. -, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014), which Appellants cite, is not to the contrary. See also Util. Air Regulatory Grp., 134 S.Ct. at 2441 (reaffirming that courts must bear “in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme” (internal quotation marks omitted)). Nothing in Bay Mills or Utility Air Regulatory Group purport to undermine the commonsense principle — repeatedly endorsed by the Court — that the operative text must be understood in its statutory context, nor the subsidiary principle, which follows from the first, that evidence of meaning drawn from the broader statutory context can render the operative text ambiguous on a particular question of law. Appellants’ argument in this case is illogical when east in the context of the statute as a whole.
B. The Statute Read as a Whole
1. The “Three-Legged Stool” and the Indispensable Role of the Tax Subsidies
Appellants’ interpretation is implausible because it would destroy the fundamental policy structure and goals of the ACA that are apparent when the statute is read as a whole. A key component to achieving the Act’s goal of “near-universal coverage” for all Americans is a series of measures to reform the individual insurance market. 42 U.S.C. § 18091(2)(D). These measures- — nondiscrimination requirements applying to insurers, the individual mandate, and premium subsidies — work in tandem, each one a necessary component to ensure the basic viability of each State’s insurance market. Because premium subsidies are so critical to an insurance market’s sustainability, Appellants’ interpretation of § 36B would, in the words of Appellants’ amici, cause “the structure of the ACA *419 [to] crumble.” Scott Pruitt, ObamaCare’s Next Legal Challenge, Wall St. J., Dec. 1, 2013.
This point is essential and worth explaining in detail. The ACA has been described as a “three-legged stool” in view of its three interrelated and interdependent reforms. Br. for Economic Scholars at 7. The first “leg” of the ACA is the “guaranteed issue” and “community rating” provisions, which prohibit insurers from denying coverage based on health status or history, 42 U.S.C. § 300gg-l, and require insurers to offer coverage to all individuals at community-wide rates, id. § 300gg(a). But such nondiscrimination provisions cannot function alone because of the problem of “adverse selection.” When insurers cannot deny coverage or charge sick or high-risk individuals higher premiums, healthy people delay purchasing insurance (knowing they will not be denied coverage if and when they become sick), and insurers’ risk pools thus become skewed toward high-risk individuals (as they are the only ones willing to pay the premiums). The result is that insurers wind up paying more per average on each policy, which leads them to increase the community-wide rate, which, in turn, serves only to exacerbate the “adverse selection” process (as now only those who are really sick will find insurance worthwhile). This is the so-called “death-spiral,” which Congress understood would doom each State’s individual insurance market in the absence of a multifaceted reform program. Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2626, 183 L.Ed.2d 450 (2012) (Ginsburg, J., concurring in part and dissenting in part).
This is where the individual mandate, the second “leg” of the ACA, comes in. Congress recognized:
[I]f there were no requirement, many individuals would wait to purchase health insurance until they needed care. By significantly increasing health insurance coverage, the [individual coverage] requirement, together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. The requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold.
42 U.S.C. § 18091(2)(I). Accordingly, the Act requires each individual who is not covered by an employer to purchase minimum coverage or to pay a tax penalty. 26 U.S.C. § 5000A(a)-(b). But recognizing that individuals cannot be made to purchase what they cannot afford, Congress provided that the mandate would not apply if the cost of insurance exceeds eight percent of the taxpayer’s income after subsidies. Id. § 5000A(e)(i).
The third “leg” of the ACA is the subsidies. The subsidies ensure that the individual mandate will have a broad enough sweep to attract enough healthy individuals into the individual insurance markets to create stability, i.e., to prevent an adverse-selection death spiral. Without the subsidies, the individual mandate is simply not viable as a mechanism for creating a stable insurance market: the lowest level of coverage for typical subsidy-eligible participants will cost 23% of income, meaning that these individuals will be exempt from the mandate. Id.; Br. for Economic Scholars at 17-18. Congress was informed of the importance of the subsidies to the overall legislative scheme. See Roundtable Discussion on Expanding Health Care Coverage: Hearing Before the *420 Senate Comm. On Finance, 111th Cong. 504 (2009) (statement of Sandy Praeger, Comm’r of Insurance for the State of Kansas) (“State regulators can support these reforms to the extent they are coupled with an effective and enforceable individual purchase mandate and appropriate income-sensitive subsidies to make coverage affordable.” (emphasis added)); see also Congressional Budget Office, An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act 24 (Nov. 30, 2009), (estimating that approximately 78% of people purchasing their own coverage would receive subsidies). It is thus no surprise that Congress provided generous subsidies in the ACA and, importantly, expressly linked the operation of the individual mandate to the cost of insurance after taking account of the subsidies. 26 U.S.C. § 5000A(e)(l)(B)(ii).
If nothing else, it is clear that premium subsidies are an essential component of the regulatory framework established by the ACA. If, as Appellants contend, a State could block subsidies by electing not to establish an Exchange, this would exempt a large number of taxpayers from the individual mandate, cause the risk pool to skew toward higher risk people, and effectively cut the heart out of the ACA. This is one of the points that was made in the joint opinion by Justice Scalia, Justice Kennedy, Justice Thomas, and Justice Ali-to in National Federation of Independent Business v. Sebelius:
Without the federal subsidies, individuals would lose the main incentive to purchase insurance inside the exchanges, and some insurers may be unwilling to offer insurance inside of exchanges. With fewer buyers and even fewer sellers, the exchanges would not operate as Congress intended and may not operate at all.
132 S.Ct. at 2674 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (emphasis added); see also Br. for the Appellees at 38 (“Insurers in States with federally-run Exchanges would still be required to comply with guaranteed-issue and community rating rules, but, without premium tax subsidies to encourage broad participation, insurers would be deprived of the broad policy-holder base required to make those reforms viable.”). This “adverse selection” is precisely what Congress sought to avoid when it enacted the individual mandate. 42 U.S.C. § 18091(2)(I). It is unfathomable that Congress intended to allow States to effectively nullify the individual mandate, which it recognized was necessary to the viability of an individual insurance market subject to the “guaranteed issue” and “community rating” requirements.
Section 36B cannot be interpreted divorced from the ACA’s unmistakable regulatory scheme in which premium subsidies are an indispensable component of creating viable and stable individual insurance markets. Due regard for the carefully crafted legislative scheme casts § 36B in a clearer light. “Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.” Am. Trucking Ass’ns, 531 U.S. at 468, 121 S.Ct. 903. If Congress meant to deny subsidies to taxpayers in States with HHS-created Exchanges — thereby initiating an adverse-selection death-spiral that would effectively gut the statute in those States — one would expect to find this limit set forth in terms as clear as day. But the subsection defining which taxpayers are eligible for subsidies make no mention of State-established Exchanges. Subsidies are available to an “applicable taxpayer,” 26 U.S.C. § 36B(a), and “applicable taxpayer” is defined as any individual whose household income for the *421 taxable year is between 100% and 400% of the poverty line, id. § 36B(e)(Z )(A).
A comparison with the ACA’s Medicaid expansion condition offers a striking case in point. This condition demonstrates that Congress knew how to speak clearly and provide notice to States when it intended to condition funding on State behavior. The Medicaid provision lays out an express conditional statement in the form of “if, then “If the Secretary, after reasonable notice and opportunity for hearing,” determines that the State is not in compliance with the Medicaid-expansion requirements, the Secretary “shall notify such State agency that further payments will not be made to the State.” 42 U.S.C. § 1396c (emphasis added). This provision stands in stark contrast to § 36B. The formula for calculating subsidies does not say, for example, “If a State does not create an Exchange, its taxpayers shall be ineligible for premium credit subsidies,” or “If coverage is purchased on an Exchange established by HHS, premium credit subsidies will not be available.” Furthermore, § 1396c ensures that States receive notice before Medicaid funding is withheld. In contrast, there is no similar notice to States that their taxpayers will be denied subsidies if the State elects to have HHS create an Exchange on its behalf.
The majority thinks it unremarkable that Congress would condemn insurance markets in States with federally-created ■ Exchanges to an adverse-selection death spiral. It reaches this conclusion by observing that, in peripheral statutory provisions, Congress has twice created insurance markets that suffered from the defect of having guaranteed issue requirements without the other measures (such as a mandate or subsidies) necessary to ensure the soundness of the market. Congress did this, the majority notes, in the provisions covering the Northern Mariana Islands and other federal territories, see 26 U.S.C. § 5000A(f)(4); 42 U.S.C. § 201(f), and in the Community Living Assistance Services and Supports (CLASS) Act, Pub.L. No. 111-148, §§ 8001-8002, 124 Stat. 119, 828-47 (2010).
This argument entirely misses the point. These peripheral statutory provisions say nothing about the core provisions of the ACA at issue here, as both the majority and the Appellants recognize. In both provisions, Congress purposely decided not to impose an individual mandate. That is a crucial difference. The Government and supporting amici’s position in this case relies on Congress’ express recognition that the individual mandate, “together with the other provisions of this Act, will minimize ... adverse selection,” and that, as such, the mandate “is essential to creating effective health insurance markets” with guaranteed-issue requirements. 42 U.S.C. § 18091(2)(I) (emphasis added). This recognition, together with Congress’ linking the mandate to the subsidies available to taxpayers, 26 U.S.C. § 5000A(e)(l)(B)(ii), demonstrates that Congress appreciated that subsidies would be an integral part of ensuring that the individual mandate reached broadly enough to secure the viability of the insurance market. By not imposing individual mandates in the peripheral markets identified by the majority (i.e., in the territories and the CLASS Act), Congress displayed a willingness to tolerate the risk that these markets would succumb to adverse selection. Congress displayed no such willingness here; in the markets covered by the core provisions of the ACA, Congress imposed an individual mandate linked to subsidies as an “essential” tool to ensure market viability. 42 U.S.C. § 18091(2)(I).
Appellants suggest that because Congress enacted peripheral statutory provisions covering territories and in the *422 CLASS Act without including measures to ensure a broad base of healthy customers to stabilize prices and avoid adverse selection, it is reasonable to assume that Congress did the same thing with respect to the core provisions of the ACA. But this argument gets it backwards. The CLASS Act and the provisions covering the federal territories importantly demonstrate that when Congress determined to expose an insurance market to significant adverse selection risk, it specifically declined to enact an individual mandate. In other words, Congress acted intentionally when it passed the CLASS Act and the provisions covering the federal territories without an individual mandate. The core provisions of the ACA include an individual mandate, which of course indicates that Congress meant to treat the core provisions of the ACA differently,
Appellants’ arguments to the contrary are perplexing, to say the least. Congress’ omissions of an individual mandate — which it recognized as an “essential” tool to prevent adverse selection, 42 U.S.C. § 18091(2)(I) — from the peripheral statutory provisions cited by the majority are not evidence that Congress had some monolithic statute-wide tolerance of the risk that insurance markets might succumb to adverse selection. To the contrary, Congress’ intentional omissions in these peripheral insurance markets of a tool it knew to be important to preventing adverse selection merely indicates that Congress had a substantially higher tolerance for the risk of adverse selection in such markets vis-a-vis the core markets where it did impose the individual mandate. The CLASS Act and the provisions covering the territories thus do not rebut the Government’s structural argument. Indeed, if anything, the subsequent history concerning the territories and the CLASS Act serve only to highlight that Congress was correct in its judgment that an individual mandate — accompanied by subsidies to ensure its scope was sufficiently large — was necessary to stave off adverse selection in insurance markets. As Appellants note, without an individual mandate, the CLASS Act was “unworkable,” which led Congress to repeal it. Reply Br. for Appellants at 15.
The Government and supporting ami-ci ’s structural argument in this case cannot be dismissed as idle meanderings into legislative history. It is apparent from the statutory text of the ACA that Congress understood (1) the importance of a broadly applicable individual mandate that works “together with the other provisions” to ensure the viability of an insurance market against the threat of adverse selection, 42 U.S.C. § 18091(2)(I), and (2) the necessity of taxpayer subsidies to broaden the scope of the individual mandate, see 26 U.S.C. § 5000A(e)(i )(B)(ii). In giving short shrift to the clear statutory scheme adopted by Congress when it enacted the core provisions of the ACA, the majority has ignored congressional intent and improperly rejected the reasonable interpretations of HHS and IRS. In sum, the majority has drawn the wrong lesson from the CLASS Act and the provisions covering federal territories, which demonstrate just the opposite of the conclusion reached by the majority.
2. The Advance Payment Reporting Requirements of § 36B(f)(3)
One of the subsections in § 36B — which is the section upon which Appellants stake their case — makes it clear that Congress intended that taxpayers on HHS-created Exchanges would be eligible for subsidies. Subsection (f), entitled “Reconciliation of credit and advance credit,” tasks the IRS with reducing the amount of a taxpayer’s end-of-year premium tax credit under § 36B by the sum of any advance payments of the credit. 26 U.S.C. § 36B(f). *423 Crucially, subsection (f) establishes reporting requirements that expressly apply to HHS-created Exchanges. Id. § 36B(f)(3) (citing 42 U.S.C. § 18041(c)). These reporting requirements mandate that Exchanges provide certain information to the IRS, including the “aggregate amount of any advance payment of such credit”; information needed to determine the taxpayer’s “eligibility for, and the amount of, such credit”; and “[information necessary to determine whether a taxpayer has received excess advance payments.” Id. § 36B(f)(3)(C), (E), (F). The self-evident primary purpose of these requirements— reconciling end-of-year premium tax credits with advance payments of such credits — could not be met with respect to Exchanges created by HHS on behalf of a State if these Exchanges were not authorized to deliver tax credits. Indeed, HHS-created Exchanges would have nothing to report regarding subsidies were they barred from giving any. It is thus plain from subsection (f) that Congress intended credits under § 36B to be available to taxpayers in States with HHS-created Exchanges.
Appellants’ attempts to minimize the importance of the reporting requirements are specious. They first argue that, even if credits are unavailable on federally-created Exchanges, the reporting provision would nevertheless serve a purpose: to enforce the individual mandate to buy insurance. This amounts to a sleight of hand. The argument ignores the clear purpose — apparent from the statutory text — of subsection (f) and its reporting requirements. The purpose is front and center in the subsection’s title — “Reconciliation of credit and advance credit,” id. § 36B(f) — and is reinforced by the wording and structure of the provision. Consistent with its title, subsection (f) charges the IRS with reconciling the ultimate tax credit to be paid with any advanced payments of the credit, id. § 36B(f)(Z), including advance payments that “exceed the credit allowed” for the tax year, id. § 36B(f)(2). The IRS, of course, can accomplish these tasks only if it has adequate information, and the next paragraph, § 36B(f)(3), establishes the reporting requirements that ensure that the IRS has the information it needs to satisfy the terms of the statute. See id. § 36B(f)(3)(C), (E), (F) (requiring disclosure of information concerning advanced payments of tax credits). Obviously, some of the information covered by subsection (f)(3) will also assist in enforcing the individual mandate. But much of the information required to be disclosed by subsection (f)(3) is irrelevant to the purpose hypothesized by Appellants (i.e., to enforcing the mandate). See id. § 36B(f)(3)(F) (mandating the reporting of “[ijnformation necessary to determine whether a taxpayer has received excess advance payments”); id. § 5000A(e)(l)(A)-(B) (in determining whether an individual is exempted from the mandate, the statute takes account of the “amount of the credit allowable,” but not the amount of excess advance payments).
In a letter submitted to the court before oral argument, Appellants cited an IRS regulation, 26 C.F.R. § 1.6055-1(d)(1), that addresses information reporting requirements. “In order to reduce the compliance burden on” insurers, the IRS decided not to require insurers “to report under section 6055 for coverage under individual market qualified health plans purchased through an Exchange because Exchanges must report on this coverage under section 36B(f)(3).” Information Reporting of Minimum Essential Coverage, 79 Fed.Reg. 13,220, 13,221 • (Mar. 10, 2014). Appellants seem to think that this regulation somehow vindicates their view of § 36B(f)(3), but their *424 argument makes no sense. That the IRS determined that additional reporting by insurers in specified circumstances was unnecessary does not imply that Congress drafted § 36B(f)(3) solely to enforce the individual mandate, as Appellants would have it. What is clear here is that § 36B(f)(3) establishes reporting requirements for the principal purpose of requiring disclosure of information concerning advanced payments of tax credits, a purpose which cannot be squared with Appellants’ interpretation under which no credits are available on federally-created Exchanges.
Appellants also argue that the reporting provisions in subsection § 36B(f) are already over-inclusive because they apply to plans serving taxpayers who, by reason of their income, are ineligible for subsidies. The implication suggested by Appellants— and accepted too easily by the majority — is that the reporting requirements in § 36B(f)(3) already suffer from over-inclusiveness (since such taxpayers will have neither credits nor advance payments) and that there is thus little reason to be concerned about the additional over-inclusiveness generated by Appellants’ interpretation of § 36B. Framing the issue in this manner obscures a fundamental difference. Interpreting § 36B to foreclose credits on federally-created Exchanges would not merely increase the “over-inclusiveness” of § 36B(f)(3)’s reporting requirements; it would render certain of the reporting requirements pointless as to every single taxpayer on an HHS-created Exchange. This is a nonsensical interpretation because Congress enacted the § 36B(f)(3) reporting requirements to apply to HHS-created Exchanges. Id. § 36B(f)(3) (citing 42 U.S.C. § 18041(c)). The provision is powerful evidence that Congress intended that tax credits be available on federally-created Exchanges.
3. Other Provisions
There are two other provisions of the ACA that strongly support the Government’s claim that the statute, read as a whole, permits taxpayers who purchase insurance in non-electing States to receive subsidies. First, the statute defines a “qualified individual” as a person who “resides in the State that established the Exchange.” 42 U.S.C. § 18032(f)(£ )(A)(ii). There is no separate definition of “qualified individual” for States with HHS-created Exchanges. If an HHS-created Exchange does not count as established by the State it is in, there would be no individuals “qualified” to purchase coverage in the 34 States with HHS-created Exchanges. This would make little sense.
Second, in a subparagraph entitled “Assurance of exchange coverage for targeted low-income children unable to be provided child health assistance as a result of funding shortfalls,” the ACA requires States to “ensure” that low-income children who are not covered under the State’s child health plan are enrolled in a health plan that is offered through “an Exchange established by the State under [§ 18031].” 42 U.S.C. § 1397ee(d)(3)(B). Here again, the statute simply presumes that the existence of such State-established exchanges. The statute’s objective of “assuring] exchange coverage for targeted low-income children ” would be largely lost if States with HHS-created Exchanges are excluded. There is nothing in the statute to indicate that Congress meant to exclude benefits for low-income children in the 34 States in which HHS has established an Exchange on behalf of the State.
In view of the foregoing, Appellants’ reliance on Bay Mills is entirely misplaced. In citing that case, Appellants simply cherry pick language which appears favorable *425 to their side but which does not reflect the Court’s reasoning. It is true, of course, that courts have no “roving license” to disregard a statute’s unambiguous meaning. 134 S.Ct. at 2034. This was an important point in Bay Mills because it was undisputed in that case that the plaintiffs position could not be squared with the plain meaning of the statute. And the plaintiff in Bay Mills failed “to identify any specific textual or structural features of the statute to support its proposed result.” Id. at 2033 (emphasis added). Bay Mills is plainly inapposite. Here, by contrast, there is considerable evidence — textual and structural — to render the ACA ambiguous on the question whether § 36B operates to bar tax subsidies in States in which HHS has established an Exchange on behalf of the State. And, as shown above, when the ACA is read as a whole— including its “textual [and] structural features,” “purpose,” “history and design,” id. at 2033-34 — -it is clear that the Government’s interpretation of the ACA is permissible and reasonable, and, therefore, entitled to deference under Chevron.
C. Appellants’ Extraordinary Subsidies-As-Incentive Argument
The foregoing examination of the statute shows that when the terms of § 36B are read “with a view to their place in the overall statutory scheme,” Nat’l Ass’n of Home Builders, 551 U.S. at 666, 127 S.Ct. 2518, Appellants’ plain meaning argument fails. Appellants obviously recognize that their argument resting on § 36B in isolation, apart from the rest of the ACA, is ridiculous. This is clear because, in an effort to bolster their claim, Appellants proffer the extraordinary argument that Congress limited subsidies to State-run Exchanges as an incentive to encourage States to set up their own Exchanges. Br. for Appellants at 28. As noted above, this argument is nonsense. Appellants have no credible evidence whatsoever to support their subsidies-as-incentive theory.
The record indicates that, when the ACA was enacted, no State even considered the possibility that its taxpayers would be denied subsidies if the State opted to allow HHS to establish an Exchange on its behalf. Not one. Indeed no State even suggested that a lack of subsidies factored into its decision whether to create its own Exchange. Br. of Members of Congress and State Legislatures at 24-25 & n.30 (citing authorities). “States were motivated by a mix of policy considerations, such as flexibility and control, and ‘strategic’ calculations by ACA opponents, not the availability of tax credits.” Id. at 24-25 n. 30 (citing authorities). The fact that all States recognized and protested the Medicaid expansion condition, while no State raised any concern over the purported subsidy-condition shows that Appellants’ argument is at best fanciful. See Br. for the Appellees at 42 (“[T]he twenty-six plaintiff states in [Nat’l Fed’n of Indep. Bus., 132 S.Ct. 2566,] repeatedly contrasted the Medicaid eligibility expansion with the ‘real choice that the ACA offers States to create exchanges or have the federal government do so.’ ” (quoting Br. for State Pet’rs on Medicaid, Florida v. HHS, No. 11-400, 2012 WL 105551, at *51 (2012))).
The legislative history also indicates that Congress assumed subsidies would be available on HHS-created Exchanges. First, earlier proposals for the legislation and an earlier version of the House Bill provided that the federal government would establish and operate Exchanges. Halbig v. Sebelius, — F.Supp.3d -, -, 2014 WL 129023, at *17 (D.D.C. Jan. 15, 2014) (citing Reconciliation Act of 2010, H.R. 4872 §§ 141(a), 201(a) (2010) (version reported in the House on March 17, 2010); H. Rep. No. 111-443, at 18, 26 (2013)). When the legislation was modified so that *426 States could operate their own Exchanges, the Senate Finance Committee expressly acknowledged that the federal government could “establish state exchanges.” Id. (citing S.Rep. No. 111-89, at 19 (2009) (“If these [state] interim exchanges are not operational within a reasonable period after enactment, the Secretary [of HHS] would be required to contract with a nongovernmental entity to establish state exchanges during this interim period.”) (emphasis added)).
In addition, the three House Committees with jurisdiction over the ACA legislation issued a fact sheet explaining that States would have a choice whether to create their own Exchanges or have one run by the federal government, and “the Exchanges” would make health insurance more affordable. The fact sheet recognized income level as the only criteria for subsidy-eligibility. Br. for Members of Congress and State Legislatures at 11-12. The Joint Committee on Taxation also reported that the subsidies would be available to those who purchase insurance through “an exchange.” Id. at 12. And Congressional Budget Office estimates assumed that subsidies would be available nationwide. Letter from Douglas W. El-mendorf, Director, CBO, to Rep. Darrell E. Issa, Chairman, House Committee on Oversight and Government Reform (Dec. 6, 2012) (“To the best of our recollection, the possibility that those subsidies would only be available in states that created their own exchanges did not arise during the discussions CBO staff had with a wide range of Congressional staff'when the legislation was being considered.” (emphasis added)).
The truth is that there is nothing in the record indicating that, aside from wanting to afford States flexibility, Congress preferred State-run to HHS-run Exchanges. Appellants have not explained why Congress would want to encourage States to operate Exchanges rather than the federal government doing so, nor is there any indication that Congress had this goal. “[T]he purpose of the tax credits was not to encourage States to set up their own Exchanges. Indeed, making the tax credits conditional on state establishment of the Exchanges would have empowered hostile state officials to undermine the core purpose of the ACA, a result that [the] architects of the ACA wanted to avoid, not encourage.” Br. for Members of Congress and State Legislatures at 22.
Furthermore, Appellants assume without any basis that denying taxpayers premium subsidies would put political pressure on States to create Exchanges. This assumption runs counter to Appellants’ own theory of harm: After all, Appellants object to the subsidies because they impose additional financial obligations on individuals and employers by triggering the individual mandate and assessable payments for employers. These obligations would not attach if the subsidies were not available in the State. Because the subsidies trigger additional costs for individuals and employers, it is not obvious that they would be popular among taxpayers or cause taxpayers to pressure their States to create Exchanges.
The single piece of evidence that Appellants cite to support their claim that Congress intended to restrict subsidies to State-run Exchanges is an article by a law professor. Br. for Appellants at 40 (citing Timothy S. Jost, Health Insurance Exchanges: Legal Issues, O’Neill Inst., Georgetown Univ. Legal Ctr., no. 23 (Apr. 7, 2009)). There is no evidence, however, that anyone in Congress read, cited, or relied on this article.
III. Conclusion
The Supreme Court has made it clear that “[t]he plainness or ambiguity of statu *427 tory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Robinson, 519 U.S. at 341, 117 S.Ct. 843. We cannot review a “particular statutory provision in isolation.... It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” Nat’l Ass’n of Home Builders, 551 U.S. at 666, 127 S.Ct. 2518. Following these precepts and reading the ACA as a whole, it is clear that the statute does not unambiguously provide that individuals who purchase insurance from an Exchange created by HHS on behalf of a State are ineligible to receive a tax credit. The majority opinion evinces a painstaking effort — covering many pages — attempting to show that there is no ambiguity in the ACA. The result, I think, is to prove just the opposite. Implausible results would follow if “established by the State” is construed to exclude Exchanges established by HHS on behalf of a State. This is why the majority opinion strains fruitlessly to show plain meaning when there is none to be found.
The IRS’s and HHS’s constructions of the statute are perfectly consistent with the statute’s text, structure, and purpose, while Appellants’ interpretation would “crumble” the Act’s structure. Therefore, we certainly cannot hold that that the agencies’ regulations are “manifestly contrary to the statute.” This court owes deference to the agencies’ interpretations of the ACA. Unfortunately, by imposing the Appellants’ myopic construction on the administering agencies without any regard for the overall statutory scheme, the majority opinion effectively ignores the basic tenets of statutory construction, as well as the principles of Chevron deference. Because the proposed judgment of the majority defies the will of Congress and the permissible interpretations of the agencies to whom Congress has delegated the authority to interpret and enforce the terms of the ACA, I dissent.