================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 196
Sue/Perior Concrete & Paving,
Inc.,
            Respondent,
        v.
Lewiston Golf Course Corporation,

            Appellant,
et al.,
            Defendants.

        Edmund C. Goodman, for appellant.
        Gregory P. Photiadis, for respondent.
        Seneca Nation of Indians, amicus curiae.

PIGOTT, J.:

        Defendant Lewiston Golf Course Corporation (Lewiston

Golf) is an indirect, wholly owned subsidiary of the Seneca

Nation of Indians, a federally recognized Indian tribe.  We are

asked to decide whether that corporation is protected from suit

by the Seneca Nation's sovereign immunity.  Applying the factors

- 1 -

set out in <u>Matter of Ransom v St. Regis Mohawk Educ. & Community Fund</u> (86 NY2d 553 [1995]), we hold that it is not.

I.

In 2002, the Seneca Nation's legislative body, the Tribal Council, granted a corporate charter to Seneca Gaming Corporation (Seneca Gaming), under the laws of the Seneca Nation, to develop, finance, operate and maintain gaming facilities. Seneca Gaming is wholly owned by the Seneca Nation.  In the same year, again under the laws of the Seneca Nation, the Tribal Council granted a corporate charter to Seneca Niagara Falls Gaming Corporation (Seneca Niagara), created as a wholly owned subsidiary of Seneca Gaming, to develop, finance, operate and conduct the business of the Nation's gaming operations in Niagara County specifically.  Seneca Gaming and Seneca Niagara are two of the most financially successful revenue-producing assets of the Seneca Nation.

Lewiston Golf was incorporated in June 2007, under the laws of the Seneca Nation, as a wholly owned subsidiary of Seneca Niagara, to develop, finance, operate and conduct the business of an 18-hole golf course in the Town of Lewiston.  The following month, it acquired real property from Seneca Niagara, on which to construct the golf course.  The property is not part of any Indian reservation and is not sovereign land.

As Lewiston Golf's predecessor had explained in its application to Niagara County Industrial Development Agency for

tax abatements and deferrals,[1] it was "looking to create a championship level public/semi-private golf course offering the millions of visitors [to] the Niagara Falls region and the patrons of the Seneca Niagara Casino & Hotel a new tourist destination project that will attract golf enthusiasts from Canada and the United States[,] and to capitalize on the growing tourist market, which will create new jobs and allow for prolonged stays in the area."

In resolving to authorize the creation of Lewiston Golf, the Tribal Council stated that

> "the Lewiston Golf Course [would] be developed and operated as an amenity to [Seneca Niagara]'s casino operations, together with the casino's lodging, dining, retail and entertainment amenities, the purpose of which amenities is to enhance the overall success and profitability of the casino's operations consistent with the powers described in [Seneca Niagara]'s charter and the purposes for which [Seneca Niagara] was formed . . . [T]he use of a separate corporation or legal entity to own and operate the Lewiston Golf Course is advisable due to various legal and accounting considerations, including the status of the Lewiston Golf Course as an off-territory business venture of the Nation, subject to legal, tax and other requirements that are not applicable to the Nation's on-territory business . . . [T]he Nation desires to

---

[1] The application was approved, and eventually Lewiston Golf and the Niagara County Industrial Development Agency entered into a Payment-In-Lieu-Of-Tax (PILOT) Agreement, providing for Lewiston Golf to make payments in lieu of taxes, as well a Lease Agreement and Leaseback Agreement.  In this manner, Lewiston Golf was granted certain exemptions from real property and sales taxes.

establish [Lewiston Golf] as a separate legal entity, governmental instrumentality of the Nation, and wholly-owned subsidiary of [Seneca Niagara], for the purpose of developing and operating the Lewiston Golf Course in the Town of Lewiston, New York, and legally doing business in such jurisdictions."

Lewiston Golf's charter describes in detail the nature of the relation between it and the Seneca Nation.  The charter provides that:

- "[n]o activity of [Lewiston Golf] nor any indebtedness incurred by it shall encumber, implicate or in any way involve assets of the Nation or another Nation Entity not assigned or leased in writing to [Lewiston Golf]"

- "the Nation shall not be liable for the debts or obligations of [Lewiston Golf], and [Lewiston Golf] shall have no power to pledge or encumber the assets of the Nation"

- "[t]he Obligations of [Lewiston Golf] shall not be a debt of the Nation or of [Seneca Gaming] or any other Nation-chartered Gaming corporation" and

- "[t]he Company shall not have[ ] any power . . . to borrow or lend money on behalf of the Nation, or to grant or permit or purport to grant or permit any right, lien, encumbrance or interest in or on any of the assets of the Nation."

On the other hand, the Boards of Directors of Lewiston Golf, Seneca Gaming, and Seneca Niagara are identical, are appointed by the Tribal Council, and during this dispute were composed entirely of enrolled members of the Seneca Nation. Lewiston Golf, like Seneca Gaming and Seneca Niagara, is required by its charter to obtain approval from the Seneca Nation before undertaking significant expenditures of resources or personal

property; adopting, amending, or repealing corporate by-laws; providing significant guarantees or incurring significant liabilities; lending money to other Seneca Nation entities; buying, selling, or encumbering real property; entering into financing arrangements involving securities; or entering into, performing, or canceling contracts with any government or government agency. Lewiston Golf, like Seneca Gaming and Seneca Niagara, must keep detailed corporate and financial records and submit for the Seneca Nation's approval an annual statement of its financial condition. And Lewiston Golf, once again like Seneca Gaming and Seneca Niagara, is required to receive consent from the Seneca Nation before taking such legal actions as commencing a lawsuit, consenting to a court's jurisdiction, or waiving a claim to sovereign immunity.

## II.

In the summer of 2007, plaintiff Sue/Perior Concrete & Paving, Inc. (Sue/Perior) entered into a contract with Lewiston Golf, whereby Sue/Perior would build a golf course on the property, for the sum of $12,700,000. However, the business relationship between Sue/Perior and Lewiston Golf deteriorated in 2009. Sue/Perior demanded payment of certain bills; Lewiston Golf insisted that Sue/Perior was seeking remuneration for work not done or exaggerating its costs. Sue/Perior filed mechanic's liens, the third of which is in the amount of $4,130,538, for materials furnished and labor performed.

Sue/Perior commenced this foreclosure action against Lewiston Golf and other defendants in June 2010, with respect to that mechanic's lien.  Lewiston Golf counterclaimed for willfully exaggerated lien, fraud, breach of contract, and unjust enrichment.  Sue/Perior subsequently amended its complaint to add additional defendants – Seneca Niagara, Seneca Gaming, and 15 corporate officers and directors – and to assert additional causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, quantum meruit, promissory estoppel, and fraud.[2]

Seneca Niagara, Seneca Gaming, Lewiston Golf and the individual defendants moved to dismiss Sue/Perior's complaint pursuant to CPLR 3211, alleging protection from suit under the sovereign immunity of the Seneca Nation.  Supreme Court denied the motion to dismiss, ruling, as pertinent here, that Lewiston Golf did not qualify as an "arm" of the Seneca Nation.  Lewiston Golf appealed.  For its part, Sue/Perior withdrew claims against all defendants except Lewiston Golf.

The Appellate Division affirmed Supreme Court's order,

_____

[2] Sue/Perior also commenced a separate action against Seneca Gaming, Seneca Niagara, and certain individual defendants – but not Lewiston Golf – alleging tortious interference with contract, tortious interference with prospective business advantage, concerted action, and prima facie tort (punitive damages).  The Appellate Division dismissed Sue/Perior's complaint (Sue/Perior Concrete & Paving, Inc. v Seneca Gaming Corp., 99 AD3d 1203 [4th Dept 2012]).  We take no position on whether that appeal was properly decided.

as modified in a manner not relevant here (109 AD3d 80 [4th Dept 2013]).  In ruling that Lewiston Golf lacked sovereign immunity, the Appellate Division relied on our decision in Matter of Ransom.  There, we set out factors for courts to consider when deciding whether a tribal subagency or a corporate entity affiliated with an Indian tribe is entitled to sovereign immunity, as the tribe itself is.  The Appellate Division found that most of the Ransom factors, and in particular those that the Ransom court "characterized as the '[m]ore important[]' financial factors, weigh in favor of a determination that [Lewiston Golf] does not share in the Nation's sovereign immunity" (109 AD3d at 88, quoting Ransom, 86 NY2d at 559 [square brackets in Appellate Division opinion]).  The Appellate Division noted, for example, that "[Lewiston Golf]'s charter clearly provides that [Lewiston Golf] has no power to bind or otherwise obligate the funds of the Nation" and that "the record is devoid of evidence that a lawsuit against [Lewiston Golf] would adversely impact the Nation's treasury either directly or indirectly" (109 AD3d at 91).

     With respect to the non-financial factor comparing Lewiston Golf's purposes with those of the Nation, the Appellate Division found that statements by the Tribal Council and the documents Lewiston Golf submitted to the Industrial Development Agency in support of its request for economic assistance "reflect that the purpose of [Lewiston Golf] . . . is several steps removed from the purposes of tribal government . . .  [T]he

central purpose of the golf course project was not to provide funds for traditional governmental programs or services but, rather, was to serve as a regional economic engine . . . Notably absent is any reference to improving the quality of life on reservation lands, creating jobs for Native Americans living on the reservation, or generating funds to support educational, social, or other government-related programs for tribal members" (id. at 89-90 [internal quotation marks omitted]).

Finally, the Appellate Division observed "that declining to extend sovereign immunity to [Lewiston Golf] under the circumstances of this case will not diminish the policies underlying tribal sovereign immunity. . . . Here, permitting [Lewiston Golf] to retreat behind the Nation's cloak of sovereign immunity after it held itself out as an independent, market-participating entity subject to the jurisdiction of the State of New York, including its courts, would discourage non-Indians from entering into business relationships with the Nation's corporations, which may well retard the Nation's economic growth and undermine one of the purposes of its sovereign immunity" (109 AD3d at 92 [internal quotation marks, citations and square brackets omitted]).

The Appellate Division granted Lewiston Golf leave to appeal to this Court, certifying the question whether its order was properly made. We now affirm and answer the certified question in the affirmative.

III.

Indian tribes possess the common law immunity from suit traditionally enjoyed by sovereign powers, unless waived.  In Matter of Ransom, we set out several factors[3] for courts to use to determine whether an entity, such as a corporation or agency, that is affiliated with an Indian tribe has the right to claim sovereign immunity against suit.

> "Although no set formula is dispositive, in determining whether a particular tribal organization is an 'arm' of the tribe entitled to share the tribe's immunity from suit, courts generally consider such factors as whether: [1] the entity is organized under the tribe's laws or constitution rather than Federal law; [2] the organization's purposes are similar to or serve those of the tribal government; [3] the organization's governing body is comprised mainly of tribal officials; [4] the tribe has legal title or ownership of property used by the organization; [5] tribal officials  exercise control over the administration or accounting activities of the organization; and [6] the tribe's governing body has power to dismiss members of the organization's governing body.  More importantly, courts will consider whether [7] the corporate entity generates its own revenue, whether [8] a suit against the corporation will impact the tribe's fiscal resources, and whether [9] the subentity has the power to bind or obligate the funds of

---

[3] Some commentators justifiably refer to our "nine factors" (see e.g. Gregory J. Wong, Note & Comment, Intent Matters: Assessing Sovereign Immunity for Tribal Entities, 82 Wash L Rev 205, 220 [2007]), but the last two, or last three, factors have often been treated as one by courts citing Ransom, generating an eight-factor or seven-factor test (see e.g. Seneca Niagara Falls Gaming Corp. v Klewin Bldg. Co., Inc., 2005 WL 3510348 [Superior Ct of Connecticut, Jud Dist of New London 2005]).  We too treat the last three factors as closely interrelated.

the tribe.  The vulnerability of the tribe's
coffers in defending a suit against the
subentity indicates that the real party in
interest is the tribe."  (Ransom, 86 NY2d at
559-560 [internal quotation marks, citations,
and square brackets omitted; numbering
added].)

Applying these factors, we held in Ransom that the St.
Regis Mohawk Education and Community Fund – a nonprofit
corporation, organized under the District of Columbia Nonprofit
Corporation Act, providing educational, health care, social and
historical services to residents of the St. Regis Mohawk
Reservation in Franklin County – was a tribal entity that enjoyed
sovereign immunity from suit.  We explained that "[t]he Fund was
established to enhance the health, education and welfare of Tribe
members, a function traditionally shouldered by tribal
government.  Additionally, the Fund received its resources from
the Tribe, and the Tribe was designated by the Fund as the
recipient of its funds and services.  Critically, under its
by-laws, the Fund's governing body may only be comprised of
elected Chiefs of the Tribe.  Thus, the Fund's provision of
social services on behalf of and under the direct fiscal and
administrative control of the Tribe renders it an entity so
closely allied with and dependent upon the Tribe that it is
entitled to the protection of tribal sovereign immunity" (id. at
560).

We begin our discussion of the present appeal with the
functions or purposes factor.  The question is whether Lewiston

Golf's purposes are similar to, or serve, those of the Seneca Nation.  The Appellate Division reasoned that Lewiston Golf's purposes are significantly different from those of tribal government, because Lewiston Golf has functioned to develop an amenity outside the Seneca Nation's reservation land that would serve as a regional economic engine, not to promote tribal welfare on the reservation directly.

Lewiston Golf and the dissent rely on Kiowa Tribe of Okla. v Manufacturing Technologies, Inc. (523 US 751 [1998]), in which the Supreme Court of the United States held that "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation" (523 US at 760).  In Kiowa Tribe, a private party sued an Indian tribe for defaulting on a promissory note, and asked the courts to limit tribal immunity to suits involving conduct on reservations or involving noncommercial activities.  The Supreme Court refused to create a "reservation" or a "commercial activity" exception to the doctrine of tribal sovereign immunity from suit.  Recently, a sharply fractured Supreme Court declined to revisit that decision (see Michigan v Bay Mills Indian Community, 572 US —, —, 134 S Ct 2024 [2014]).

Lewiston Golf contends that it is inconsistent with Kiowa Tribe to treat the fact that an Indian tribe's subsidiary engages primarily in commercial activities not located on the

tribe's reservation as evidence that the subsidiary is not an "arm" of the tribe.  We disagree.  Kiowa and Bay Mills do not apply in the present appeal, because they concerned lawsuits against Indian tribes themselves, not against corporate affiliates of tribes.  They do not illuminate questions concerning whether such an entity is an "arm" of the tribe.  The United States Supreme Court has never held that corporations affiliated with an Indian tribe have sovereign immunity.

As the Appellate Division notes, the primary purpose of creating the golf course in Lewiston was to act as a regional economic engine and thereby serve the profit-making interests of the Seneca Nation's casino operations in the area.  While this may result in more funds for government projects on the Seneca Nation's reservations and elsewhere that benefit members of the tribe, we agree with the Appellate Division that the purposes of Lewiston Golf were sufficiently different from tribal goals that they militate against Lewiston Golf's claim of sovereign immunity.  However, the purposes factor of Ransom is not determinative, and we proceed to discuss the other criteria. While some of the remaining Ransom factors favor the conclusion that Lewiston Golf is protected by sovereign immunity, the most important ones strongly support the opposite conclusion.

IV.

It is true that Lewiston Golf was organized under tribal law, not federal law, and that Lewiston Golf's governing

body is comprised of tribal officials.  The Seneca Nation controls Lewiston Golf's Board of Directors, which is made up exclusively of enrolled members of the Nation appointed by the Tribal Council.  Moreover, it is clear from the record that tribal officials exercise control over the administration or accounting activities of Lewiston Golf, and that the tribe's governing body has power to dismiss members of Lewiston Golf's governing body.  Indeed, the Tribal Council has exclusive authority to remove members of Lewiston Golf's Board.  These considerations indicate that Lewiston Golf is dependent on the Seneca Nation in a manner that might suggest it partakes in the Nation's sovereign immunity.

However, all the remaining Ransom factors, and particularly those that consider the financial relationship between the subsidiary or agency and the Indian nation, support the conclusion that Lewiston Golf lacks sovereign immunity.

First, the Seneca Nation does not have legal title or ownership of the golf course being developed by Lewiston Golf.  Contrary to the Seneca Nation's contention, the question posed by this factor is not whether Lewiston Golf is owned by the tribe.  Rather, the issue is whether the property used by Lewiston Golf is owned by the tribe, and the record leaves no room for doubt that the owner of the golf course is Lewiston Golf, not the Seneca Nation.

Next, and most significantly, the record firmly

indicates the intent to ensure that a suit against Lewiston Golf will not impact the Seneca Nation's fiscal resources.  The founding charter provided that no indebtedness incurred by it would "in any way involve assets of the Nation . . .", which would "not be liable for the debts or obligations" incurred by Lewiston Golf.  The charter stated that Lewiston Golf would have no power to allow "any right, lien, encumbrance or interest in or on any of the assets of the Nation."  All the evidence in the record points to the conclusion that Lewiston Golf lacks the power to bind or obligate the funds of the Seneca Nation.

In response, Lewiston Golf does not deny that the statements in the charter have their ordinary meaning and that the Seneca Nation intended to create a corporation for whose debts it would not be liable.  Lewiston Golf does not contend that the Seneca Nation's independent coffers are vulnerable.  Rather, it argues that a lawsuit against Lewiston Golf would have an economic impact on the Seneca Nation because revenues that would otherwise be distributed to the Nation will not be available.  Lewiston Golf expressly concedes that it generates its own revenue, rather than being dependent on the resources of the Seneca Nation.

Whether Lewiston Golf's revenues will become part of the Seneca Nation's resources, as Lewiston Golf emphasizes, is beside the point.  The test, with respect to the financial relationship factors of Ransom, is not the indirect effects of

any liability on the tribe's income, but rather whether the immediate obligations are assumed by the tribe.  Here, the financial obligations were assumed by Lewiston Golf and any liability insurer, not by the Seneca Nation.

These financial relationship considerations are the most important of the Ransom factors, as we noted when we first set out the criteria (see Ransom, 86 NY2d at 559).  In attributing such weight to them, we have taken into consideration federal precedent on the Eleventh Amendment immunity of States. While the sovereign immunity of an Indian tribe is not based on the Federal Constitution, it has in common with Eleventh Amendment immunity "a background of traditional ideas about the power and privileges of the sovereign" (Runyon v Ass'n of Vill Council Presidents, 84 P3d 437, 440 n 12 [Sup Ct of Alaska 2004]; see Thebo v Choctaw Tribe of Indians, 66 F 372, 376 [8th Cir 1895]).  In considering whether an entity is an "arm" of an Indian tribe, the most significant factor is the effect on tribal treasuries, just as "the vulnerability of the State's purse" is considered "the most salient factor" in determinations of a State's Eleventh Amendment immunity (Hess v Port Authority Trans-Hudson Corporation, 513 US 30, 48 [1994]).

If a judgment against a corporation created by an Indian tribe will not reach the tribe's assets, because the corporation lacks "the power to bind or obligate the funds of the tribe" (Ransom, 86 NY2d at 559), then the corporation is not an

"arm" of the tribe.  However, if a tribe is legally responsible for a corporation's obligations, the tribe is "the real party in interest" (id. at 560).  As the Supreme Court of Alaska has observed, in a thoughtful opinion, "a tribe might, for commercial purposes, wish to form a corporation exposed to suit in order to cultivate trust with business partners. . . .  The tribes' use of the corporate form protects their assets from being called upon to answer the corporation's debt.  But this protection means that they are not the real party in interest" (Runyon, 84 P3d at 441; accord e.g. American Property Management Corp. v Superior Court, 206 Cal App 4th 491, 506 [Ct of App of California, 4th App Dist, Div One 2012]; Uniband, Inc. v Commissioner of Internal Revenue, 140 TC 230, 255 [US Tax Ct 2013]; Seaport Loan Prods., LLC v Lower Brule Community Dev. Enter. LLC, 41 Misc 3d 1218 [A] [Sup Ct NY County 2013]).[4]  In short, protection of a tribal treasury against liability in a corporate charter is strong evidence against the retention of sovereign immunity by the corporation.

The dissent's principal objection to our ruling is that lower courts have found that Seneca Gaming and Seneca Niagara have sovereign immunity (see dissenting op at 7-12, citing Sue/Perior Concrete & Paving, Inc., 99 AD3d 1203; Seneca Niagara

_____

[4] While the Alaska Supreme Court's opinion concerned a nonprofit corporation shielding members from liability under state law, not tribal law, its analysis is equally pertinent here in that the Seneca Nation created a corporation with a charter expressly protecting the Nation from liability.

Falls Gaming Corp., 2005 WL 3510348; Warren v United States, 859

F Supp 2d 522 [WD NY 2012], affd 517 Fed Appx 54 [2d Cir 2013];

Myers v Seneca Niagara Casino, 488 F Supp 2d 166 [ND NY 2006]).

Neither this Court nor the United States Supreme Court has so

held, and our decision today may imply the opposite.  As noted

above, the question whether a corporate affiliate of an Indian

tribe is protected by the tribe's sovereign immunity has not been

settled by the United States Supreme Court.[5]  Therefore, even

assuming that it is a pure question of federal law, we remain at

liberty to answer it in a manner that may conflict with the

determinations of courts in our federal circuit.  Contrary to the

dissent, New York State courts are not bound by the decisions of

federal courts other than the United States Supreme Court, on

questions of federal constitutional law (see Arthur Karger,

Powers of the New York Court of Appeals § 1:8 at 18 [3d ed rev

2005]).  It is well-established that "the interpretation of a

Federal constitutional question by the lower Federal courts may

serve as useful and persuasive authority for our Court while not

binding us.  This Court in its long-standing tradition and

independent responsibility has exercised its correlative

adjudicative power on questions of Federal law" (People v Kin

---

[5] Nor has it been addressed by the United States Court of
Appeals for the Second Circuit, which treated the question
cursorily in a summary order that lacks precedential force (517
Fed Appx 54; see 2nd Cir Local Rule 32.1.1 [providing that
decisions "by summary order do not have precedential effect"]).

Kan, 78 NY2d 54, 60 [1991] [citations omitted] [emphasis added], citing New York R.T. Corp. v City of New York, 275 NY 258, 265 [1937], affd 303 US 573 [1938] [noting that a decision of the Second Circuit, "while entitled to great weight, is not binding on this court"]; see also e.g. People v Konstantinides, 14 NY3d 1, 13 [2009]; Matter of Mason, 100 NY2d 56, 58 [2003]).  The same principle applies here.

Alternatively, it could be argued that Seneca Gaming and Seneca Niagara are distinguishable from Lewiston Golf in that their purposes are more closely aligned with those of the Seneca Nation.  In any case, that question is not before us, and the dissent simply begs the question, assuming – what has not been held by this Court or the Supreme Court – that Lewiston Golf's corporate parents have sovereign immunity.

In conclusion, we agree with the Appellate Division that the most significant Ransom factors count against sovereign immunity on the part of Lewiston Golf.  Its ruling was proper. It is unnecessary for us to address the parties' remaining contentions.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Sue/Perior Concrete & Paving, Inc. v Lewiston Golf Course Corp.

No. 196

RIVERA, J.(dissenting):

The question on this appeal is whether a corporate subsidiary of a corporation owned and controlled by an Indian Tribe, and which exists solely for the economic benefit of the tribe and its members, is immune from private suit based on the Tribe's sovereign immunity. I can find no rational legal basis to distinguish between the corporate parent, which is a recognized arm of the Tribe, and its subsidiary. Therefore, I would find the subsidiary is immune from suit.

I.

The Seneca Nation of Indians ("the Nation") is a sovereign Tribe, predating the creation of the United States, with its own government, laws and cultural identity (see Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 79 Fed Reg 4748-02 [2014]; Seneca Nation of Indians v State of N.Y., 26 F Supp 2d 555, 560 [WD NY 1998], affd sub nom Seneca Nation of Indians v New York, 178 F3d 95 [2d Cir 1999]). As a tribal sovereign it provides its members with various health and education-related services and programs, which are dependent on the Nation's

- 1 -

financial stability and well-being.  The Nation has identified the gaming industry as "vitally important to the economy of the Nation and the general welfare of its members" (Seneca Gaming Corporate Charter Law Enactment, Council of the Seneca Nation of Indians, August 1, 2002).  As part of its economic development activities it has created and chartered, under the Nation's corporate charter, three interlocking corporate entities, intended to further the Nation's gaming operations, all for the benefit of its members.

The Nation created the Seneca Gaming Corporation ("Seneca Gaming") to "finance, develop, construct, operate, and maintain Nation Gaming Facilities."  The Nation then created the Seneca Niagara Falls Gaming Corporation ("Seneca Niagara Falls Gaming") as a subsidiary of Seneca Gaming, for purposes of "developing, financing, operating and conducting the business of the Nation Gaming Facility" on Nation territory located in Niagara County, New York.[1]  Seneca Niagara Falls Gaming is subject to the "control, operation and management" of Seneca Gaming.

The Nation decided to capitalize on the subsequent success of its gaming operations, and Seneca Niagara Falls Gaming commenced development of a golf course in the Town of Lewiston, New York in Niagara County.  The Nation thereafter created the

---

[1] The Nation Gaming Facility operates in accordance with the Indian Gaming Regulatory Act ("IGRA") and the Compact between the Nation and New York State.

Lewiston Golf Course Corporation ("Lewiston Golf") "as a separate legal entity, governmental instrumentality of the Nation, and wholly-owned subsidiary of [Seneca Niagara Falls Gaming], for the purpose of developing and operating the Lewiston Golf Course."

All three of the Nation's resolutions creating Seneca Gaming, Seneca Niagara Falls Gaming, and Lewiston Golf, and their respective corporate charters provide

> "it is declared the policy of the Nation to promote the welfare and prosperity of its members and to actively promote, attract, encourage and develop economically sound commerce and industry through governmental action for the purpose of preventing unemployment and economic stagnation; and the economic success of the Nation's gaming operations is vitally important to the economy of the Nation and the general welfare of its members."

Plaintiff Sue/Perior Concrete & Paving, Inc., a contracting company who had previously done business with the Nation, entered a contract with Lewiston Golf to construct the golf course. After certain payment disputes, plaintiff filed a mechanic's lien foreclosure action against Lewiston Golf in Niagara County. Plaintiff also filed an action in Erie County against several of the same defendants, with the exception of Lewiston Golf, but Erie County Supreme Court dismissed that action based on the sovereign immunity of Seneca Gaming and Seneca Niagara Falls Gaming.

Lewiston Golf moved to dismiss the action, asserting sovereign immunity against suit as an arm of the Nation. Supreme

Court and the Appellate Division both rejected this contention, and held that Lewiston Golf is not an arm of the Nation.  The majority now agrees, and based on Matter of Ransom v St. Regis Mohawk Educ. and Community Fund, Inc. (86 NY2d 553 [1995]) concludes that because Lewiston Golf is without power to bind or obligate the Nation's funds it lacks a sufficient financial relationship with the Nation to entitle it to sovereign immunity.

I disagree with the majority that certain financial factors identified by this Court in Ransom and as applied here, should be treated as outcome determinative of the question of the expanse of the Nation's sovereign immunity over its corporate subsidiary Lewiston Golf.  Instead, our focus should be the purpose and corporate structure of Lewiston Golf.  As a corporate entity created and chartered by the Nation, established to enhance the Nation's gaming operations for the purpose of benefitting the Nation's members, I would hold Lewiston Golf is clothed with the Nation's sovereign immunity.

## II.

Tribes are " 'separate sovereigns preexisting the [United States] Constitution' " (Michigan v Bay Mills Indian Community, 134 S Ct 2024, 2030 [2014], quoting Santa Clara Pueblo v Martinez, 436 US 49, 56 [1978]), and possess " 'common-law immunity from suit traditionally enjoyed by sovereign powers' " (id., quoting Santa Clara Pueblo, 436 US at 58).  Indeed, "sovereign immunity is an inherent part of the concept of

sovereignty and what it means to be a sovereign" (<u>Breakthrough</u> <u>Mgt. Group, Inc. v Chukchansi Gold Casino and Resort</u>, 629 F3d 1173, 1182 [10th Cir 2010]), and "is 'a necessary corollary to Indian self-governance' " (<u>Bay Mills Indian Community</u>, 134 S Ct at 2030, quoting <u>Three Affiliated Tribes of Fort Berthold</u> <u>Reservation v Wold Engineering, P.C.</u>, 476 US 877, 890 [1986], and citing The Federalist No. 81, p. 511 [B. Wright ed. 1961] [A. Hamilton] [It is "inherent in the nature of sovereignty not to be amenable" to suit without consent]). Sovereignty immunity serves interests essential to tribal identity, and is fundamental to the survival and growth of Tribes and their members. Moreover, immunity is " 'necessary to promote the federal policies of tribal self[-]determination, economic development and cultural autonomy' " (<u>Breakthrough Mgt. Group, Inc.</u>, 629 F3d at 1182 [modification in original], quoting <u>Am. Indian Agric. Credit</u> <u>Consortium, Inc. v Standing Rock Sioux Tribe</u>, 780 F2d 1374, 1378 [8th Cir 1985]).

The United States Supreme Court has broadly applied tribal sovereign immunity to extend to "suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off" Indian lands (<u>Kiowa Tribe of Oklahoma v Mfg. Tech., Inc.</u>, 523 US 751, 760 [1998]; <u>see</u> <u>also</u> <u>Bay Mills Indian Community</u>, 134 S Ct at 2030-31). There are no exemptions for tribal commercial activity (<u>see</u> <u>Cayuga Indian Nation of New York v Seneca County, N.Y.</u>, 761

F3d 218, 221 [2d Cir 2014]), and, thus, sovereign immunity extends to tribal business ventures (Oklahoma Tax Com'n v Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 US 505, 510 [1991]).  Immunity may be limited only by Congress or express waiver of a tribe (Kiowa, 523 US at 754).

Unsurprisingly, "tribes across the country, as well as entities and individuals doing business with them, have for many years relied on [Supreme Court precedent], negotiating their contracts and structuring their transactions against a backdrop of tribal immunity" (Bay Mills Indian Community, 134 S Ct at 2036, referencing Kiowa, 523 US 751).  Over the years tribal activities have grown, "tribal gaming revenues have increased more than thirty fold," and "other tribal enterprises, ranging from cigarette sales to ski resorts" have flourished (Bay Mills Indian Community, 134 S Ct at 2037; see id. at 2050-2051 [Thomas, J., dissenting]).  "[T]ribal business operations are critical to the goals of tribal self-sufficiency because such enterprises in some cases 'may be the only means by which a tribe can raise revenues.'  This is due in large part to the insuperable (and often state-imposed) barriers Tribes face in raising revenue through more traditional means"  (id. at 2043 [Sotomayor, J., concurring] [citations omitted]).

## III.

As federal courts have held, the Seneca Nation of Indians has immunity from suit based on its status as a sovereign

Indian Nation (<u>Seneca Nation of Indians</u>, 178 F3d 95) and that Seneca Niagara Falls Gaming and Seneca Gaming are arms of the Nation (<u>Warren v United States</u>, 859 F Supp 2d 522, 540 [WD NY 2012], <u>affd</u> 517 Fed Appx 54 [2d Cir 2013]; <u>Myers v Seneca Niagara Casino</u>, 488 F Supp 2d 166 [ND NY 2006]) fully clothed with the Nation's sovereign immunity.  The question of whether Lewiston Golf, another subentity of the Nation, may assert sovereign immunity then seems a rather straightforward one, and one which should be decided in Lewiston Golf's favor.

Tribal sovereignty, including immunity from suit, "is subject to the superior and plenary control of Congress [and] without congressional authorization, the Indian Nations are exempt from suit" (<u>Santa Clara Pueblo</u>, 436 US at 58] [quotation marks and citation omitted]).  As such, tribal immunity is "a matter of federal law and is not subject to diminution by the States" (<u>Kiowa</u>, 523 US at 756).  The Nation is a sovereign with its own government and rights to self-determination, and as such empowered to determine how best to structure its business ventures.  Therefore, we are without authority absent congressional limitation, to reject the Nations's adoption of a corporate structure that furthers its economic development goals.

The majority relies on this Court's decision in <u>Ransom</u> for the legal framework by which to decide Lewiston Golf's sovereign immunity.  However, <u>Ransom</u> was decided before the United States Supreme Court announced its decisions in <u>Kiowa</u> and

<u>Bay Mills Indian Community</u> recognizing sovereign immunity applied broadly to Indian business ventures, even those outside Indian lands.  Therefore, the factors in <u>Ransom</u> cannot supercede federal proscriptions, and we must be cautious not to rely on these factors in a way that conflicts with federal law.

The record makes abundantly clear that the Nation created Lewiston Golf as a commercial business venture to increase the Nation's gaming revenues for the benefit of the Tribe and its members.  The Nation determined that the best way to pursue this goal is through a corporate structure whereby Lewiston Golf is controlled by the Nation's corporate entity.  As a sovereign, the Nation is certainly able to decide that this corporate arrangement will enhance its economic independence and sustain its tribal membership and self-sustaining tribal government.  The Nation, having made that choice, is no less entitled to expect that the protections afforded by its sovereign immunity will apply equally to the activities of Lewiston Golf as it does to the activities of Seneca Gaming and Seneca Niagara Falls Gaming.

The logic of treating uniformly the corporate entities for sovereign immunity purposes is illustrated by comparing Lewiston and Seneca Niagara Falls Gaming.  As their respective corporate charters reveal, Seneca Niagara Falls Gaming and Lewiston Golf are strikingly similar, both are owned by an arm of the Nation (Seneca Gaming in the case of Seneca Niagara Falls

Gaming, and Seneca Niagara Falls Gaming in the case of Lewiston
Golf), and both are controlled and run by the Nation.  Both seek
to increase the Nation's revenue, with the obvious difference
that Niagara Falls Gaming was created for the "purpose of
developing, constructing, owning, leasing, operating, managing,
maintaining, promoting and financing a Nation Gaming Facility on
Nation territory within the exterior boundaries of Niagara County
pursuant to the terms of the [gaming] Compact," and Lewiston
Golf's purpose is to "develop[], construct[], own[], leas[e],
operat[e], manag[e], maintain[], promot[e] and financ[e] the
Lewiston Golf Course on land" which at the time of Lewiston
Golf's creation was owned by Seneca Niagara Falls Gaming.  Thus,
one exists to maintain a casino for the Nation's benefit, the
other exists to maintain a golf course to enhance casino revenues
for the Nation's benefit.  Both improve the Nation's economic
position.  Moreover, not only are they similar in purpose and
service to the Nation and its members, but Lewiston Golf is
intended as an amenity to the casino to "further the economic
success of the Nation's gaming operations."  The point of both
business enterprises is to bring revenues to the Nation.[2]  If the
golf course was owned by Seneca Niagara Falls Gaming, a

---

[2]There is certainly nothing unique in establishing a golf
course as an economic development venture.  As Lewiston Golf
points out, New York has several public golf courses that are
public amenities that "create jobs and support economic
development."

recognized arm of the Nation, there would be no question that sovereign immunity would foreclose plaintiff's suit against Lewiston Golf. Consequently, there is no logical basis to treat Lewiston Golf differently simply because it is a subsidiary of Seneca Niagara Falls Gaming.

Therefore, I can find no legally defensible ground for rejecting sovereign immunity to Lewiston Golf, a corporate entity that is established under the Nation's laws and constitution, chartered by the Nation to develop, construct and operate a golf course in furtherance of the Nation's existing gaming operations, and, consistent with the Seneca Niagara Falls Gaming charter, controlled by Nation officials who make all significant business decisions. Like its parent Seneca Niagara Falls Gaming, Lewiston Golf is an engine for tribal economic development and growth.

The majority claims that there is no legal support for presuming Seneca Gaming and Seneca Niagara Falls Gaming's sovereign immunity. However, in Warren the district court, as affirmed by the Second Circuit, held that Seneca Gaming "is a government instrumentality entitled to immunity" (859 F Supp 2d at 541), finding specifically that Seneca Gaming

> "is incorporated under Seneca tribal law; it was created to generate income to provide for the general welfare of [the Nation's] members; a majority of the board of directors are enrolled Senecas; [Seneca Gaming's] principal place of business is on the Cattaraugus reservation; all important corporate acts require approval of the tribal Council; the tribal Council may remove [Seneca Gaming] board members for cause"

(id.).  In <u>Myers</u>, the district court stated that Seneca Niagara
Falls Gaming "enjoys all of the privileges and immunities of the
Nation" (<u>Myers v Seneca Niagara Casino</u>, 488 F Supp 2d at 168 n
2).  Thus, it is undisputed that under federal law these entities
are entitled to the Nation's sovereign immunity.

Nevertheless, the majority casts these decisions to the
wind, and asserts that in the instant appeal it may ignore
federal precedent and place in question sovereign immunity as it
applies to the Seneca Gaming and Seneca Niagara Falls Gaming, and
a fortiori Lewiston Golf (majority op, at 17).  According to the
majority, it is free to apply outdated decisions, propound
unfounded conclusions, and clear its own path on the question of
sovereign immunity until such time as the United States Supreme
Court speaks on the issue.  Well the Supreme Court has spoken,
and we are bound to comply with its pronouncement that tribal
sovereign immunity is a federal matter "not subject to diminution
by the states" (<u>Kiowa</u>, 523 US at 756).  Thus, our Court is
without authority to render tribal commercial activities
meaningless by subjecting tribal entities to suit in
contravention of federally recognized immunity.  Consequently,
with respect to Seneca Gaming and Seneca Niagara Falls Gaming the
law is currently settled in New York that they are arms of the
Nation and clothed with sovereign immunity.[3]

---

[3]Realizing that it cannot avoid federal law, the majority
opines that perhaps Lewiston Golf is different from the other

Implicit in the majority's argument for rejecting Lewiston Golf's claim is the notion that the corporate form, and the protections therein, categorically bars the extension of sovereign immunity.  This is simply an irrelevant consideration because the sovereign immunity of a tribe extends to its subordinate economic entities (see e.g. Native Am. Distrib. v Seneca-Cayuga Tobacco Co., 546 F3d 1288 [10th Cir 2008] [tobacco manufacturer]), including corporate entities (see e.g. Memphis Biofuels, LLC v Chickasaw Nation Industries, Inc., 585 F3d 917, 921 [6th Cir 2009] [tribal conglomerate was an arm of the Tribe; incorporating under 25 USC § 477, i.e. a Section 17 corporation, did not automatically waive tribal sovereign immunity]; Koscielak v Stockbridge-Munsee Community, 340 Wis 2d 409, 418 [2012] [golf course and supper club], review granted, 342 Wis 2d 155]).

The majority rests its decision on Lewiston Golf's apparent inability to bind or obligate the funds of the Seneca Nation.  As noted above, the financial and administrative duties and obligations of Lewiston Golf vis-a-vis the Seneca Nation are nearly identical to those of Seneca Niagara Falls Gaming.

---

Seneca corporate entities because the purposes of Seneca Gaming and Seneca Niagara Falls Gaming are more aligned with those of the Nation (majority op, at 18).  The record belies any such distinction.  Indeed, the corporate charters are quite clear that the purpose of these three entities is to benefit the Nation and its members through "government action for the purpose of preventing unemployment and economic stagnation," achieved through the economic success of the Nation's gaming operations.

According to their charters, neither can bind nor obligate the funds of the Seneca Nation.  Yet, Seneca Niagara Falls Gaming is an arm of the tribe (see Sue/Perior Concrete & Paving, Inc. v Seneca Gaming Corp., 99 AD3d 1203 [4th Dept 2012]; Seneca Niagara Falls Gaming Corp. v Klewin Bldg. Co., Inc., 2005 WL 3510348, at *5 [Conn Super Ct Nov. 30, 2005] [Niagara Falls Gaming, which is a wholly owned subsidiary of Seneca Gaming is a governmental instrumentality of the Seneca Nation]; Warren, 859 F Supp 2d at 540-41 [Seneca Gaming entitled to immunity; finding Seneca Gaming charter provisions incorporated in all relevant respects into the Seneca Niagara Falls Gaming charter], citing Klewin Bldg. Co., Inc., 2005 WL 3510348, at *5, affd 517 Fed Appx 54 [2d Cir 2013]; Myers, 488 F Supp 2d at 168 n 2).

In deciding the expanse of sovereign immunity, our focus should be on the purpose and goals of the corporate entity. We should look to whether the corporate entity furthers tribal self-determination and self-governance, and as such, benefits the tribe's members.  Therefore, I would not rely primarily on Ransom's financial interconnectedness factors.  Indeed, federal and state courts have criticized the multi-factor approach to subordinate economic analysis as contravening Kiowa (see Kiowa, 523 US at 754-55; Breakthrough Mgt. Group, Inc., 629 F3d at 1185-89 [expressly overruling district court's holding that financial interconnectedness is a threshold factor]; Cash Advance and Preferred Cash Loans v State, 242 P3d 1099, 1110 n 12 [Colo 2010]

[distinguishing Ransom as pre-Kiowa]).  Moreover, Runyon, also a pre-Kiowa case, was an expressly narrow ruling, which relied on Ransom and Alaska corporate law (Runyon v Ass'n of Vill Council Presidents, 84 P3d 437, 441 [Sup Ct of Alaska 2004], citing Alaska Stat § 10.20.051 [b]).

## IV.

Plaintiff argues that even if Lewiston Golf is entitled to sovereign immunity, that immunity has been waived and thus it is subject to suit. I can find no basis in law or the record to support waiver.  As the United States Supreme Court has made clear, "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity" (Kiowa, 523 US at 754).  Just this past term, in Michigan v Bay Mills Indian Community, the Supreme Court reaffirmed, not only that it is for Congress "to abrogate tribal immunity for off-reservation commercial conduct," but that Congress has chosen not to do so (134 S Ct at 2031).

As the court in Ransom recognized, "preserving tribal resources and tribal autonomy are matters of vital importance" and waiver of "sovereign immunity cannot be implied but must be unequivocally expressed" (Ransom, 86 NY2d at 560-61, quoting Santa Clara Pueblo, 436 US at 58 [internal quotations marks omitted]).  "[W]aivers are strictly construed in favor of the tribe" (Ransom, 86 NY2d at 561, quoting Rupp v Omaha Indian Tribe, 45 F3d 1241, 1245 [8th Cir 1995] [internal quotations

marks omitted]).

Plaintiff's contract with Lewiston Golf lacks any express waiver of sovereign immunity.  Plaintiff seeks to avoid sovereign immunity arguing that Lewiston Golf is subject to suit for the mechanics lien foreclosure.  However, courts have failed to recognize the distinction between in rem and in personum jurisdiction asserted by the respondent (see Cayuga Indian Nation of New York, 761 F3d 218, 220; Oneida Indian Nation of New York v Madison County, Oneida County, N.Y., 605 F3d 149, 159 [2d Cir 2010]; vacated on other grounds and remanded sub nom. Madison County, N.Y. v Oneida Indian Nation of New York, 562 US 42 [2011]).  Regardless, the suit ultimately seeks to enforce Lewiston Golf's alleged debt to the plaintiff, and does not seek title to the land, so even plaintiff's in rem theory must fail.

I would reverse the Appellate Division because Lewiston Golf is entitled to sovereign immunity, therefore I dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed, with costs, and certified question answered in the affirmative.  Opinion by Judge Pigott.  Judges Graffeo, Smith and Abdus-Salaam concur.  Judge Rivera dissents in an opinion in which Chief Judge Lippman and Judge Read concur.

Decided November 25, 2014